GeeeN, Judge,
delivered the opinion of the court:
The plaintiff is trustee in bankruptcy for the Bickel Dredging Corporation and brings this suit to recover $62,166.12 alleged to have been due the Bickel Corporation for dredging done under a contract made with the defendant. The defendant denies any liability.
*605 It appears without controversy that a written contract was entered into between the Bickel Corporation and the defendant about September 14, 1928, under which the Bickel Corporation, hereinafter referred to as the contractor, agreed to. do certain dredging in the vicinity of Norfolk harbor at an agreed price per cubic yard and in accordance with certain provisions and specifications to which reference will hereinafter be made. The contractor began the work about the date last mentioned and was paid for the work which it did in the months of September, October, and November, in accordance with the contract, less retained percentages, but when the contractor presented its claim for work done in December, the engineer officer who had general charge and supervision of the work on behalf of the Government having been informed in substance that the contractor had been dumping material excavated at a place other than that fixed by the contract, payment was made to the contractor only after a large deduction had been made. The contractor, however, continued the work, but when the time for payment again arrived no payment was made for the additional work done and the contractor was notified by the engineer officer that payment was subject to further deduction for the removal of material improperly dumped, which deduction would be made at the time of final settlement. The contractor continued the work until March 2, 1929, and then stopped. It had then dredged a total of 870,251 cubic yards of material, which, at the contract rate, amounted to $150,553.43. It has been paid for dredging a total of $88,387.31, leaving unpaid the amount for which it now brings suit. About April 29, 1929, the engineer officer notified the contractor that its right to proceed with the work under the contract was terminated. In the latter part of June a bonding company, which had become surety for the performance of the contract by the contractor, was authorized to complete the work and did proceed with it, but a considerable portion of it finally had to be done by the defendant. After the work was completed, the defendant, through the Comptroller General’s office, made a settlement with the bonding company, in which it deducted $51,694.55, being the cost *606 of certain redredging of material which was claimed to have been wrongfully dumped by the contractor. A further deduction of $2,350 was made as liquidated damages for delay in completing the contract. Credit was given for the work which the bonding company had done, and it was paid $38,340.27.
The contract provided in substance that the material excavated must be transported and deposited within the limits of certain established dumping grounds, that material deposited elsewhere would not be paid for, and the contractor might be required to redredge such material and deposit it where directed. The contract further provided that if, in the opinion of the contracting officer, any material was dumped so as to be dangerous to or obstruct navigation, the contractor should give notice thereof and remove the same with the utmost dispatch, and in case it neglected or delayed so to do, the material could be removed by the contracting officer and the cost of such removal be deducted from any money due or to become due the contractor. (See latter part of finding IV for exact language used in the contract.)
There was also a provision in the contract for liquidated damages in case of delay. (See finding IV.)
It will be observed on consideration of the case that the issue between the parties is primarily one of fact, the question being whether any dumping was done contrary to the provisions of the contract, and if so to what extent and quantity. It is contended on behalf of the defendant that the contractor did such dumping and to such an extent that considering the payments made there is now nothing due on the contract. On behalf of the plaintiff it is contended that there was no such dumping and that in any event it was very much less than the quantity for which deductions were made by the defendant.
It would serve no useful purpose to undertake to review at length the testimony given in the case. The testimony as to dumping is conflicting and the evidence as to the quantity thereof indefinite, where it would seem it might well have been made reasonably exact and it would seem that the wrongful dumping could not have been done without the *607 connivance of the Government inspector who accompanied the scows. But from the whole of the evidence we are entirely satisfied that there was wrongful dumping, that it was intentional, and that it obstructed navigation; but as to the amount thereof, beyond a certain definite figure which will be specified further on, we find no testimony from which even an approximation may be made. Some facts appear from the evidence as to which there is little or no controversy. The material excavated was to be moved about twenty miles to the established dumping grounds to which reference has been made above. On the way to the dumping grounds, about fifteen miles therefrom, was the channel of the Elizabeth River which had heretofore been dredged and its depth and the amount of fill from natural causes observed. After being informed that the contractor was making short dumping, defendant’s engineer in charge caused a survey to be made of this channel, which, in connection with the other facts established by the evidence, showed that 158,352 cubic yards of material had recently been dumped in the channel of the Elizabeth River opposite the site of the Army Base within a strip thereof approximately 3,370 feet long. Another survey was later made which showed that more material had been dumped at the same place but beyond this nothing is shown by the evidence as to the results of the second survey. The testimony also shows that the contractor did other short dumping but the amount thereof is not anywhere shown by the evidence. In this connection it should be said that the fact that the defendant introduced no evidence of what the second survey showed with reference to the amount of dumping in the Elizabeth River channel tends to show that its claim with reference thereto is not well founded.
The plaintiff, however, contends that even if there was short dumping the contractor could not be charged with the cost of removal unless it had been notified to remove the material by defendant and that no such notice was ever given. We do not so construe the contract. As we view its provisions, if the contractor deposited any material where it would obstruct navigation, it was required forthwith to remove such material and in event of its failure so to do the *608 defendant could remove it at the contractor’s expense. Plaintiff also insists, and as we think rightly, that the contractor could not be properly charged with the entire cost of the dredging done by defendant in the channel of the Elizabeth River. Attention is called to the fact that the Government removed 600,000 yards of material from this channel, and that the total amount dredged, up to the time when it is practically conceded that the wrongful dumping was stopped, was only about 572,871 cubic yards. It may also be said in this connection that not only is there no testimony as to any wrongful dumping in the daytime but it would seem improbable that the contractor’s employees did any under such circumstances when it would have so easily been detected. Moreover, there is no claim that all of the material moved at night was wrongfully dumped. Defendant’s argument on this point is based upon the theory that it cost $51,694.55 to redredge the channel of the Elizabeth River at the place where this wrongful dumping had been done, and that the contractor is chargeable with the cost without regard to the yardage. It is also argued that in order to get the material wrongfully dumped out of the channel it would have to be dredged to a lower depth than existed when the excavated materials were dumped therein. Not only no engineer, but no witness whatever, gave any testimony to such effect. It would seem reasonable that where material was dumped so as to form mounds in the channel, the cost of excavating this material under such circumstances would be more than if it was all placed at one point, and if an extra cost in removing it had been shown it could properly have been allowed to the defendant. But the contract provided only for the cost of removing the material wrongfully dumped, and we do not think the defendant can be allowed for removing other material, unless some necessity therefor is shown, and this does not appear from the evidence. We conclude therefore that the deduction to be made for the removal of material deposited in the channel of the Elizabeth River would be measured by the proportion of the amount wrongfully dumped therein, which we find to be at least 158,352 cubic yards, to the 600,000 cubic yards which were removed in redredging. Using this fraction, *609 we find the amount chargeable to plaintiff for the cost of removing the material to be $13,644.00. This sum, however, is not the only deduction which the contract authorized the defendant to make. .
As before stated, the contract provided that material deposited elsewhere than at the established dumping ground would not be paid for. This may seem a- harsh provision but what occurred in this case presents a reason for its being in the contract. The contractor well knew the location of the established dumping grounds, and the price a cubic yard of material excavated was fixed upon the assumption that the contractor would carry out the agreement and so deposit the material dredged. It is manifest that when so much of the dumping was done at night, it would be extremely difficult to determine how much material had been improperly dumped and that the contractor had a good chance of escaping detection as to any. The contractor was manifestly perpetrating a fraud upon the defendant by doing this short dumping, except in a very few instances where it might have been done to avoid sinking the scows in stormy weather. The evidence shows definitely that 158,352 cubic yards were deposited in the Elizabeth Kiver channel where it was a danger to navigation. Undoubtedly considerable more short dumping was done, but how much we cannot determine from the evidence. The contract price for this yardage was $27,394.90, which the engineer officer properly deducted from the December payment. The Comptroller General in settling with the bonding company also deducted $2,350 as liquidated damages for delay, or, in other words, for forty-seven days at $50 a day, the rate fixed in the contract. It is urged on behalf of the plaintiff that the contractor was justified in stopping the work for the reason that its pay had been stopped. We do not agree with this contention. When the engineer officer found the contractor was so carrying on its operations as to work a fraud on the defendant, we think he had the right to stop the pay of the contractor until the amount actually due the contractor could be ascertained. The contractor had violated the contract and its claim that payment should be made just the same as if it were performing the contract instead of violating *610 it has no foundation either in law or in equity. The contractor was clearly liable for liquidated damages and without going into detail we think the calculation of the Comptroller General gave it the benefit of every doubt.
The case in one respect presents a peculiar situation. Settlement was finally made with the bonding company and not with the contractor or plaintiff, and the bonding company was paid $88,340.27. The bonding company having performed part of the work was obviously entitled to pay for what it did, but no reason has been given for paying the bonding company money that was due the contractor. In the settlement, the amount of liquidated damages was deducted and also $51,694.55, representing the cost to defendant of its redredging operations. What we have said above shows that the evidence does not sustain the charge for re-dredging and that only $13,644 can be deducted on this account. As before stated, the work which the contractor did amounted, at the contract price, to $150,553.43. As against this there are three set-offs or deductions: For liquidated damages $2,350, for redredging material wrongfully deposited $13,644, and $27,394.90 on 158,352 cubic yards of material under the nonpayment clause of the contract, total $43,388.90. After making these deductions and offsets it appears that the contractor was entitled under the contract to $107,164.53 for the work which it had done. It was paid $88,387.31,.leaving $18,777.22 unpaid and due the plaintiff as trustee in bankruptcy for the contractor. Judgment will accordingly be rendered in favor of plaintiff for the sum last named.
Whaley, Judge; LittletoN, Judge; and Williams, Judge, concur.
Booth, Chief Justice, took no part in the decision of this case on account of illness.
ON MOTIONS FOR NEW TRIAL
Green, Judge,
delivered the opinion of the court:
Both plaintiff and defendant have filed motions for change in the findings of the court and for new trial, and defendant also filed a motion for judgment. The motions of defendant will first be considered.
*611 Tbe first ground of defendant’s motion for new trial is an alleged error of fact in failing to make a specific finding of fraud upon the United States in performance of the contract upon which suit is brought, and in argument defendant calls attention to certain statements in the opinion to the effect that fraud was practiced in the performance of the contract. The findings as made recite facts from which a conclusion of fraud is inevitable, and we doubt whether it would add anything to the findings to insert therein this conclusion, not only because the findings in effect show that fraud was committed but because there is nothing to show that the plaintiff or the contractor in the case had any connection with the fraud, or that any fraud was practiced directly or indirectly in the prosecution of the case.
There was no plea of fraud made on behalf of the defendant but it is contended that this was not necessary in order that the plaintiff’s petition should be dismissed and judgment rendered in favor of defendant. This matter of pleading, we think, depends upon the particular circumstances of the case, but it is not necessary to discuss this question any further than to show the error of defendant’s contention that the mere fact that fraud was practiced in the performance of the contract entitles it to judgment.
It is quite obvious that section 172 of the Judicial Code, which reads as follows:
“Any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance of any claim or of any part of any claim against the United States shall, ipso facto, forfeit the same to the Government; and it shall be the duty of the Court of Claims, in such cases, to find specifically that such fraud was practiced or attempted to be practiced, and thereupon to give judgment that such claim is forfeited to the Government, and that the claimant be forever barred from prosecuting the same ” (36 Stat. 1141),
has no application to the case at bar. The fraud which was practiced was committed by the subcontractor. There is no evidence that the contracting corporation or any of its officials had any knowledge in relation thereto, and if there had been anything in the testimony from which such knowledge might be inferred it still would not affect the plaintiff, *612 who is merely a trustee for the creditors in bankruptcy, and there is not the slightest ground to infer that he had any knowledge of this fraud or that any of his agents in the prosecution of the case attempted “ to practice any fraud against the United States in the proof, statement, establishment, or allowance ” of any part of the claim.
But it is argued on behalf of the defendant that it is not necessary to show that section 172 of the Judicial Code applies, and that if any fraud was practiced or attempted against the defendant in the execution of the contract nothing can be recovered thereon. There may be some cases to which such a rule would be applied but we are quite clear that the case at bar is not one. There are indeed many cases in which it has been held that where it appears upon the trial of the case that the contract upon which it is founded is in its nature illegal or contrary to public policy, the case should be dismissed. See Trist v. Child, 21 Wall. 441; Tool Company v. Norris, 2 Wall. 45. Counsel for defendant contend that the same result follows if there is any fraud in the performance of the contract, citing Atlantic Contracting Co. v. United States, 57 C.Cls. 185; Michigan Steel Box Co. v. United States, 49 C.Cls. 421; New York Market Gardeners’ Assn. v. United States, 43 C.Cls. 114. But these cases have no application to the case at bar. In the Atlantic Contracting Co. case and the Michigan Steel Box Co. case, there was fraud in procuring the contract. In the New York Market Gardeners’ Assn. case, fraud was charged in the performance of the contract, which fraud, if it had been proved, would have been directly attributable to the plaintiff. All that the court held in the case was that the proof was insufficient. In Furay v. United States, 34 C.Cls. 171, the plaintiff, a United States marshal, sought to recover for certain fees and charges which were in part false and fraudulent. This case of course came directly under the provisions of section 172 of the Judicial Code. None of the cases cited support the defendant’s contention that judgment should be rendered in its favor on account of fraud in the performance of the contract, and a specific finding of fraud on the part of the subcontractor is not material or necessary.
*613 It is also contended on behalf of the defendant that the plaintiff cannot recover on the contract because the work was not done in accordance with it, and also that it cannot recover on a quantum, meruit. There is no force in these objections. The contract provided just what should be done in case any of the material should be dumped elsewhere than was provided in it, and fixed a penalty for wrongful dumping. The court computed the amount due the plaintiff in accordance with the facts and the applicable provisions of the contract. The motion of the defendant for a new trial and judgment must be overruled.
Plaintiff also asks for a new trial on account of what is called newly discovered evidence, the nature of which is disclosed by an affidavit of the witness Peterson who testified on the trial that some of the dredged material was dumped in the channel opposite the Army base. In this affidavit he now says in effect that he did not understand the questions propounded to him and did not intend to so testify. This affidavit may cast some doubt upon the truth of his testimony, but there was other evidence that showed that dredged material had been dumped in this channel and the surrounding circumstances are such that we were led to conclude that the subcontractor did this dumping. The motion of plaintiff for a new trial is also overruled.
Whalet, Judge; Williams, Judge; and LittletoN, Judge, concur.
Booth, Chief Justice, took no part in this decision on account of illness.