Madden, Judge,
delivered the opinion of the court:
Plaintiff, receiver for the A. J. Peters Company, sues for an alleged unpaid balance of $30,014.80 due the Peters Company for hay sold by it to the defendant during the years 1917 to 1919. The total amount of the Peters Company’s sales to the defendant during this period was $208,542.84. Vouchers for the amount plaintiff claims here were prepared by the defendant’s agents after the hay was delivered, but the vouchers have never been paid by the defendant. It asserts that plaintiff’s claim is a fraudulent one, and is *549 therefore forfeited under an applicable statute.'[3]' It also asserts that even if there is no forfeiture, plaintiff is entitled. tp recover only $2,428.36, the amount shown to- be due by an ¡ audit made by the defendant, which, it asserts, corrected the; grades and weights of the shipments of hay and reduced the,* amounts which the defendant should have to pay for them.' ■ *.
The history of the Peters Company’s transactions with the defendant is as follows. The War Department'was.; buying large quantities of hay during the First World War. It entered into a number of contracts with the Peters Company for various quantities of hay at specified prices for the different grades. The Peters Company, of which A. J. Peters was the president and dominant figure, bought hay, from farmers in the Salt Eiver valley region of Arizona to fill its orders from the defendant.
' An association, the Salt Eiver Valley Hay Dealers Association, had been established by the hay growers and dealers, of the region, one of the purposes of which was to inspect, weigh, and grade hay which was shipped out of the region by members, and to furnish the purchaser certificates of the. association as to the grade of the hay sold. For that pur-, pose, it provided inspectors at the railroad stations from which hay was shipped. Purchasers, including the defendant, would naturally have more confidence in the certificate of an association inspector stating that his examination of the hay showed it to be of a certain grade than they would have in a similar statement by the seller of the hay. The, object of the association' apparently was to make sure that the seller received fair treatment in any controversy about the grade of the hay, and also tp build a reputation- for the association and the region for integrity in its grading..
*550 One J. N. Jaggers was tbe Chief Inspector for the association. He did not, at least in most instances, personally inspect the hay which plaintiff shipped to the defendant. Yet, in making out the association’s official inspection slips which were intended to accompany plaintiff’s invoice to the defendant, Jaggers, on all occasions when the actual inspection made by his subordinates showed hay to be of a grade inferior to that ordered by the defendant, raised the grade of the hay to make it accord with the defendant’s order. Jaggers was present in the Peters Company office much of the time. For use on occasions when he was not present, he left with the company a sheaf of association certificates signed in blank by himself, which could be filled out by the Peters Company.
The Peters Company, when it made a shipment of hay to the defendant, made out an invoice showing that a specified number of pounds of hay of a specified grade had been shipped. This invoice, accompanied by an inspection certificate signed by Jaggers for the association, and which in all instances accorded with the invoice as to grade, was sent to the defendant. The papers in evidence show that as to 5 shipments the weights marked by the actual inspectors for the association on their working slips were raised by 580, 1,000, 980, 2,005, and 1,994 pounds on the Peters Company’s invoices. As to the 42 other shipments on which the papers in evidence show that the Jaggers certificate and the Peters Company invoice raised the grade of hay above that shown by the association inspector’s slip, the Peters Company’s invoice was in agreement with the inspector’s slip as to weight. An auditor for the defendant, who studied the available information in 1920, concluded that plaintiff’s invoices had, in all the shipments, charged to the defendant 695,913 pounds more hay than had been actually shipped to it by the Peters Company. The auditor seems to have reached that conclusion by a comparison of weights recorded by the railroads which carried the hay and the weights shown on the Peters Company’s invoices.
Plaintiff claims that the raising of the grade proves nothing except a difference of opinion, presumably honest, *551 between Jaggers and the Peters Company on the one hand and Jaggers’ subordinates, the actual inspectors for the association, on the other. But neither Jaggers nor A. J. Peters inspected the hay in most instances, or had any basis for opinions differing from those of the actual inspectors. Two of those inspectors, who were called as witnesses by the defendant, testified that they followed the association rules-for grading, and that in case of doubt they gave the shipper the benefit of the doubt, i. e., the higher grade, as the rules-of the association prescribed. In these circumstances we would be credulous indeed if we were to fail to find that Jaggers and the Peters Company conspired to fraudulently grade the hay to make it correspond with that called for by the Peters Company’s contracts with the defendant. We have concluded that they did so conspire.
As to the discrepancy in weights between the Peters Company’s invoices and the railroad weights as discovered by the auditor, we are unable, on the basis of the evidence, to discover what the actual facts are. The defendant introduced 47 exhibits to show that the grade of the hay in that many carloads had been raised by Jaggers and the Peters Company. One would suppose that if there was fraud as to the weights, it would have occurred as frequently in those carloads as in others of the approximately 750 carloads shipped under the contracts. Yet as we have said, in only five carloads out of the forty-seven was there any difference in weight between that stated on the slip made out by the association inspector and that stated on the Peters invoice. The total of that difference was, in pounds, 6,559. If discrepancies in weight occurred in the same proportion in the approximately 750 carloads shipped as in the 47 as to which we have the association inspector’s slip, that would have made a discrepancy of only some 100,000 pounds in all. Yet the auditor finds that the actual weights were 695,918 pounds less than the Peters Company’s invoices. We do not find, from the evidence, that the Peters Company practiced fraud as to the weight of the hay.
Plaintiff argues that the statute forfeiting fraudulent claims does not apply to this case for the reasons (1) that the mere presentation of an invoice for goods sold does not *552 constitute a “claim” against the United States within the meaning of the statute and (2) that plaintiff here, being a receiver and personally innocent of any fraud, should not lose his claim because of the fraud of the insolvent, the Peters Company.
We think the statute is applicable to the Peters Company’s fraudulent practices, and that plaintiff as receiver takes the Peters Company’s claim cum onere. As to the first point, the presentation of a fraudulent invoice must have been within the intent of the statute, unless the word “claim” is to receive an interpretation so narrow as to exclude nearly all transactions with the government except actual suits either in-court or before a quasi judicial officer or agency. The statute giving jurisdiction to this court says that it may hear and determine the following matters, inter alia (United States Code, tit. 28, sec. 250) :
1. Claim against the United States. — First. All claims * * * founded * * * upon any contract, express or implied, with the government of the United States * * *.
If one delivers to the government a quantity of groceries pursuant to a contract, and sends an invoice or bill with them, and he is not paid as agreed, he may sue in this court, pursuant to the jurisdictional act. That means that, in Congressional parlance, he had a “claim” as soon as he had delivered the groceries and the bill or invoice therefor, and that his .invoice was,,sent'to “éstablish” or obtain the “allowance” of his claim within the meaning of Section 279. We do not think that Congress would have had any reason for distinguishing between, or showed any intention to distinguish between, the presentation of a false invoice to a purchasing agent of the government having authority to issue a voucher for its payment, and a similar presentation to the Comptroller General or to the court. In any case its purpose is to fraudulently obtain money from the United States. The statute seems to us to mean that such an attempt results in the forfeiture of whatever right might have otherwise resulted from the transaction. See Furay v. *553 United States, 34 C. Cls. 171; New York Market Gardeners’ Association v. United States, 43 C. Cls. 114.
As to the argument that the defense of fraud cannot be invoked against a receiver, who is personally innocent, it would go far to defeat the purpose of the statute if it were given such an interpretation! If the contractor could commit fraud with the chance that it would not he detected and he would enjoy the profit from it, and the assurance that, even if his fraud should be discovered, no loss would result if the suit were brought by his executor, administrator, trustee in bankruptcy, or receiver, a substantial part of the deterrent effect of the statute would be lost and there would be a considerable proportion of suits in which the defense of the statute would not be available to the government at all. There is no reason why the right of the receiver should be other than that of the insolvent whose assets the receiver is supposed to conserve and liquidate. He is not a purchaser for value without notice, or a purchaser at all. He does not take even negotiable paper free of defenses good against the insolvent (Williams v. Green, C. C. A. 4th Cir., 23 F. (2d) 796), nor legal title to property free of equities arising out of fraud or other circumstances and enforceable against the insolvent. See High, Eeceivers, 4th ed., secs. 201-206.
In the case of Baird v. United States, 76 C. Cls. 599, a subcontractor of a contractor, bankrupt at the time of suit, the suit being brought by the trustee in bankruptcy, had committed fraud in the performance of the part of the contract sublet to it. The court hel&'that the government could not, for two reasons, forfeit the claim under the fraud statute. One reason was that the subcontractor’s fraud was not, so far as concerned the application of the forfeiture statute, attributable to the contractor who had not participated in it. The other reason was that the suit was by the trustee in bankrupcy, who had had no part in the fraud. As to the second reason assigned by the court for the decision in the Baird case, we have concluded, upon a reconsideration of the question, that it is not a valid reason, and we do not follow it in this case. See Globe Indemnity Co. v. United States, 84 C. Cls. 587, certiorari denied, 302 U. S. 707.
*554 From the foregoing it follows that the defendant’s Plea of Fraud must be sustained, and the court adjudges the claims made by the plaintiff to be forfeited to the United States. It is so ordered.
Jones, Judge; Littleton, Judge; and Whaley, Ohief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.

 28 U. S. C. 279. That statute provides : “Any person who corruptly practices or attempts to practice any fraud against the United States in the' proof, statement, establishment, or allowance of any claim or any part of: any .claim against the United States shall, ipso facto, forfeit the same to the-Government; and it shall be the duty of the Court of Claims in such cases to' find specifically that such fraud was practiced or attempted to be practiced and thereupon to give judgment that such claim is forfeited to the Government, and that the claimant be forever barred from prosecuting the same.”