Donald K. ANDERSON, et al.,

and

Patricia B. Wallace, Plaintiffs,

and

Federal Deposit Insurance Corp. (as Receiver), Plaintiff–Intervenor,

v.

The UNITED STATES, Defendant.

Nos. 91–34C, 95–805C.

United States Court of Federal Claims.

Aug. 22, 2000.

Thomas D. Allen, with whom was Thomas M. Lynch, Wildman, Harrold, Allen & Dixon, Chicago, Illinois, for plaintiffs David L. Paul, David Joshua Paul and Michael M. Paul.

Michael G. Shannon, Wallace, Bauman, Legon, Fodiman & Shannon, P.A., Miami, Florida, for plaintiff Patricia Wallace.

Jon A. Stewart, with whom was Hugo A. Zia, Federal Deposit Insurance Corporation, Washington D.C., for plaintiff Federal Deposit Insurance Corporation.

Scott J. Pivnick, with whom were Jeanne E. Davidson, Deputy Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, and David W. Ogden, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## *OPINION*

SMITH, Senior Judge.

These consolidated *Winstar*-related cases are before the court on the following motions: defendant's motions to dismiss all plaintiffs; the parties' cross-motions for summary judgment as to liability; and the government's motions for summary judgment based on special pleas in fraud, along with motions to dismiss or for summary judgment against defendant on its fraud counterclaims filed by all plaintiffs.

Plaintiffs in these consolidated cases allege that the federal government breached a contractual promise to permit the former Dade Savings and Loan Association to amortize goodwill created during the supervisory acquisition and conversion of Dade by David L. Paul and a trust operating for the benefit of his two sons. The plaintiffs in these cases, however, do not agree on who the parties to the alleged contract are. The Pauls contend that they contracted directly with government regulators. The Federal Deposit Insurance Corporation, which has intervened in both cases as the successor in interest to the failed CenTrust Bank (formerly Dade Savings) contends that it is CenTrust which contracted with the government regarding the treatment of goodwill. Patricia Wallace, whose case was consolidated with the lead case here, is a former CenTrust shareholder. Her claim is premised upon the alleged goodwill contract.

Defendant has moved to dismiss the claims of the Paul plaintiffs and Mrs. Wallace for lack of standing. Defendant has cross-moved for summary judgment as to liability on the grounds that no contract was formed and, even were the court to find that a contract existed, plaintiffs committed a prior material breach. In addition, defendant has filed a summary judgment motion based on a special plea in fraud pursuant to 28 U.S.C. § 2514 on the grounds that plaintiff David L. Paul and other officers of the failed CenTrust Bank engaged in myriad fraudulent activities

which mandate the forfeiture of all plaintiffs' claims against the United States.

The case has operated under case management procedures instituted to manage similar cases in the wake of the United States Supreme Court's decision in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In resolving these motions, the court has availed itself of the individualized briefing that has taken place in this case, as well as the show cause briefing ordered in *California Fed. Bank v. United States*, 39 Fed.Cl. 753, 779 (1997), and the general Common Issue 11 briefing commissioned by the court on standing issues.

*Motions to Dismiss for Lack of Standing*

Currently pending are motions against the three Paul plaintiffs and Patricia Wallace to dismiss for lack of standing pursuant to RCFC 12(b)(1).[1] Defendant contends that the Paul plaintiffs and Mrs. Wallace are all mere shareholders who are attempting to, in effect, bring derivative claims that belong to the thrift.

Defendant's argument against the Paul's claims is easily resolved. The Paul plaintiffs have maintained, at all times, that they are bringing direct claims for breach of contract. Far from being mere shareholders of CenTrust, the Pauls contend that they were the sole contracting parties, or alternatively parties along with Dade, to a contract with federal regulators regarding the treatment of goodwill. Just because the plaintiffs, per the terms of their acquisition of Dade, ultimately became shareholders of the thrift, does not mean that they cannot possibly be parties, or third-party beneficiaries to, the alleged contract. The Paul plaintiffs have pled that they were contracting parties, or third party beneficiaries, and no rule regarding the status of shareholders or derivative suits alters that fact.

The case of Patricia Wallace is quite different. Unlike the Pauls, who contend that they were parties to the contract with the government, Patricia Wallace makes no such assertion. She is a former shareholder of CenTrust Bank who, after the acquisition and conversion of Dade, purchased 55,000 shares of CenTrust stock over a period of two years, and who subsequently sold the stock, at a substantial loss, after the passage of FIRREA in 1989. Defendant makes the following arguments. First, defendant argues that the claim of Mrs. Wallace is purely derivative because she is neither a party to, nor an intended beneficiary of, any goodwill contract. Second, defendant argues that Mrs. Wallace, for several reasons, cannot remain in the litigation to protect any interest in a surplus, as permitted by Issue Judge James T. Turner.

Plaintiff Wallace, while acknowledging that she is not a party to an alleged contract, nonetheless contends that she is a third-party beneficiary of the alleged contract. Plaintiff Wallace argues that the entire deal was structured in such a manner that shareholders like her were designed to be third-party beneficiaries. Specifically, Mrs. Wallace points to the fact that the acquisition and conversion of Dade were premised upon, among other things, a public stock offering that was designed to raise $30 million after the conversion, and that regulators recognized this and based their approval of the acquisition and conversion of Dade upon this fact. Accordingly, Mrs. Wallace contends that she, and all other shareholders in CenTrust, were intended beneficiaries of the alleged goodwill contract, because the deal anticipated the infusion of this $30 million from the public capital markets.

■ The court starts with the premise that shareholders generally are not accorded third-party beneficiary status. "While every action of a corporation is supposed to benefit its shareholders, our law has not viewed this general benefit as making every shareholder a third-party beneficiary." *Suess v. United States*, 33 Fed.Cl. 89, 94 (1995). Still, the court has been willing to accord third-party

---

1. There are five original plaintiffs in the *Anderson* case: Donald K. Anderson, Angel Cortina, Jr., David L. Paul, David Joshua Paul, and Michael Morgan Paul. On April 22, 1998, the court granted a motion of the FDIC to dismiss the claims of Messrs. Anderson and Cortina, former officers of CenTrust, without prejudice, on the grounds that the claims were actually assigned to the FDIC's predecessor in interest, the Resolution Trust Corporation. Hence, none of the motions pending are applicable to Messrs. Anderson and Cortina.

beneficiary status to plaintiffs in cases where it is clear that the essence of the transaction is to provide regulatory incentives to encourage specific investors to capitalize an institution. *See, e.g. Castle v. United States*, 42 Fed.Cl. 859, 864–65 (1999); *Glass v. United States*, 44 Fed.Cl. 73, 79 (1999).

■ In this instance, however, it is clear that Mrs. Wallace, even under the most expansive possible reading of the putative contract, is not a third-party beneficiary. Moreover, even were the court to agree with her argument that the contract was designed to accord third-party beneficiary status to those CenTrust shareholders who bought shares as part of the public stock offering contemplated by the application for conversion, Mrs. Wallace could not claim the status.

This is clear when one reviews the very document that plaintiff Wallace relies upon in making the argument that CenTrust shareholders can claim third-party beneficiary status. Indeed it is manifest that the FHLBB elected not to condition the approval of the conversion application on the cash infusion from the prospective public offering. In a Memorandum from the Regional Director of the FHLBB's Office of Examination and Supervision dated August 31, 1983, the Regional Director discusses the viability of the proposal to raise approximately $30 million from a public stock offering shortly after the conversion. But the same memorandum also concludes that the approval of the transaction should *not* be conditioned on the receipt of the funds from the public offering.[2] The CenTrust shareholders who bought stock as part of the initial public offering, then, were not granted any special status beyond being shareholders. And, while every contract that a corporation enters is presumably in some abstract sense the basis for a benefit to shareholders, it does not automatically transform a mere shareholder into a third-party beneficiary. Thus, while the court has no doubt that some shareholders may have relied upon the goodwill promise in making their decisions on whether to buy the stock during the public offering, it does not give them a right, as shareholders only, to enforce the contractual terms. That right, if it exists, belongs to the parties to the contract.

Moreover, Mrs. Wallace cannot even claim to be a third-party beneficiary. As Mrs. Wallace acknowledges, she acquired her stock on the secondary market, after the public offering, and also apparently through her husband, a CenTrust employee, through an employee purchase program. Thus, even were the court to find that the alleged contract granted third-party beneficiary status to those shareholders who bought as part of the public offering, she is not one of these shareholders. That is because the only rationale one could make for making shareholders third-party beneficiaries is that their infusion was a necessary component to getting the converted thrift into capital compliance. Plaintiff Wallace responds that the alleged contract actually was meant to confer third-party beneficiary status on all future shareholders as well. This, however, does not make sense, since the presumed benefit for the thrift would only be the initial public capital raising to fill any capital hole. Secondary buying and selling would do nothing to improve the capital position of the thrift. While Mrs. Wallace argues that future shareholders should be able to rely on any goodwill promise, that is no different, again, from the general right any shareholder of any firm has in any instance to buy or sell based on prospects or deals of the firm. If a contract is breached, it is for the firm, not the shareholder, to enforce the right.

Lastly, Mrs. Wallace is not a current holder of CenTrust stock. It is inconceivable that, even were the court to ignore the hurdles to such status mentioned above, she could assert a claim on behalf of an interest she does not own. Mrs. Wallace owns no stock and has no entitlement to any surplus that may result from any recovery by the

---

2. It is true, as plaintiff Wallace points out, that the Regional Director made this recommendation because he believed that such a condition would alarm the capital markets and conceivably hamper the offering. The motive, however, is irrelevant to the issue of interpreting the contract and determining if the contract intended for Mrs. Wallace and similarly situated shareholders to be third-party beneficiaries to a contract.

thrift.[3] Thus, she is not within the class allowed to remain in the suit by Judge James T. Turner in *Plaintiffs in All Winstar–Related Cases at the Court v. United States,* 44 Fed.Cl. 3, 11 (1999)

Accordingly, the motion of defendant to dismiss the breach of contract claim brought by Patricia Wallace is granted. To the extent that defendant's motion seeks to dismiss Mrs. Wallace's claim for pre-judgment interest premised on her contract claim, the motion is granted.[4] The court does not address the constitutional claims of Mrs. Wallace.

## CONTRACT FORMATION, BREACH AND FRAUD ISSUES

### Introduction

The court has before it the parties' motions for summary judgment on liability and the government's motions for summary judgment based on the special pleas in fraud. In large part, the critical facts that are the foundation of plaintiffs' argument that a contract existed, and defendant's argument for summary judgment based on fraud, are not in dispute. As to the question of the existence of a contract, the questions are ultimately legal: whether the essentially undisputed circumstances and documents can be considered to form a contract regarding the treatment of goodwill. In the case of the government's fraud counterclaim and summary judgment motion, the facts relied upon by the government are taken directly from the plea agreement, and criminal conviction, of plaintiff David L. Paul (and, to a lesser extent, Donald K. Anderson). The question, then, regarding the fraud summary judgment motions is whether the criminal actions to which Mr. Paul pled guilty, and those for which he was convicted by a jury, are fraudulent actions which relate to the alleged contract at issue and require forfeiture of claims of not only Mr. Paul but the other plaintiffs.

Defendant has asked the court to address the fraud counterclaim and the summary judgment motions based on the counterclaim first. Although this makes sense, since resolution of the summary judgment motions could obviate the need to address the merits of plaintiffs' underlying breach of contract claims because they would be forfeited to the government regardless of their merits, it is ultimately impossible to divorce the two. That is because the two are so intertwined: the scope of the contract is critical to the issue of whether defendant's summary judgment motions based on fraud should be granted. The court will thus address the issues of contract formation, liability, and the fraud allegations together.

### Background

Dade County Savings and Loan Association was a Florida mutual savings & loan association. The Federal Savings and Loan Insurance Corporation insured substantially all of Dade's deposits. On October 1, 1982 Dade entered into a Reorganization and Purchase Agreement with the Westport Company, whereby Dade agreed to reorganize and convert to a capital stock association, and Westport agreed to exchange certain of its assets and liabilities in return for all the capital stock issued by Dade as a result of its conversion from a mutual to a stock association. The Westport Company was an unincorporated Massachusetts trust whose Chairman and Chief Executive Officer, as well as majority shareholder, was plaintiff David L. Paul. Robert A. Paul, David L. Paul's brother, held a percentage of Westport stock in trust for the two other Paul plaintiffs, David L. Paul's sons David Joshua and Michael M. Paul.[5]

---

3. Defendant also points out that, even were Mrs. Wallace to be entitled to remain in the litigation to protect her interest in a surplus, plaintiff FDIC's claim only seeks $381.3 million, while the receivership deficit, according to defendant, stands at almost $2 billion. (Plaintiff Wallace does not dispute—indeed does not address at all—defendant's representation.) Apparently, then, there will never be, under the most wildly optimistic damage theory for the failed thrift, a surplus payable to former CenTrust shareholders.

4. The complaint of Mrs. Wallace does not address the issue of pre-judgment interest, although counsel for Mrs. Wallace averred during her deposition that she was seeking interest, and defendant moved to dismiss based on this representation from counsel.

5. Robert A. Paul held the shares of Westport, and later the shares of CenTrust, in trust until terminating the trust, and distributing the shares to David Joshua Paul and Michael M. Paul, on December 6, 1990.

On October 19, 1982, the Westport Company, on behalf of Dade Savings, submitted an Application for Supervisory Conversion to the Federal Home Loan Bank Board. In the Application, Westport informed the FHLBB:

> Dade is a financially troubled savings and loan association which will be unable to maintain itself as an independent, financially sound institution without a capital infusion or other assistance. If operating and other anticipated losses continue at their present and projected rate, [Dade's] net worth will be exhausted in considerably less than eleven months. Westport and [Dade's] directors ... are committed to preserving [Dade] as a viable free-standing entity. Accordingly, after careful consideration of all presently existing alternatives, it has been determined that supervisory conversion is the only reasonable and available option.

Westport further informed the FHLBB that, although FSLIC assistance would not be requested, "certain supervisory forebearances, waivers, findings and determinations" would be requested. Westport's Plan of Operation, which was part of the Application, specifically provided that "Purchase Accounting will be used to record the transaction."

Over a period that extended nearly a year, Westport[6] negotiated with the FHLBB over the use of the purchase method of accounting and the amortization schedule for the resulting goodwill. Amendment Two to the Application for Supervisory Conversion, dated December 2, 1982, includes a letter from the Westport Company to the FHLBB explaining that the purchase method of accounting would be used and that the resultant goodwill would be amortized over a period of forty years. The Application also includes a letter from the accounting firm Deloitte Haskins & Sells that the proposed accounting complied with generally accepted accounting principles.

According to the documents of the FHLBB, by August 1983 the FHLBB had decided that the reorganized thrift would be able to use purchase method accounting and that the resulting goodwill could be used to meet the thrift's regulatory capital requirements. The FHLBB had determined that the institution would be required to write the goodwill off over twenty-five years, rather than forty years as originally requested by Westport. The FHLBB, in its extensive review of the Application for Supervisory Conversion, assessed the viability of the transaction by assuming the use of the purchase method of accounting and amortization over a twenty-five-year period. Moreover, it is clear that the FHLBB recognized both that Dade was insolvent on a market basis and that it was trending quickly towards insolvency on a book basis.[7]

On September 8, 1983, Westport, on behalf of Dade, filed Amendment No. 10 to the Application for Supervisory Conversion, which included a letter from Deloitte Haskins & Sells, explaining that purchase accounting would be used and that it would be amortized over twenty-five years. On September 28, 1983, the FHLBB passed Resolution No. 83–549, which approved the Application as amended. The Resolution required that the "conversion ... shall be completed in accordance with the terms of the amended plan of supervisory conversion contained in the Application. The Plan of Voluntary Supervisory Conversion incorporated the Plan of Operation, which states in its business plan that 'Purchase Accounting' will be used to record the transaction."

In addition, the FHLBB Resolution required that:

---

6. Pursuant to an amendment to the Reorganization and Purchase Agreement dated November 23, 1982, the Pauls, as shareholders of Westport, substituted themselves as parties to the Agreement with Dade. It appears, by this amendment, that the Pauls, through David L. Paul and Robert A. Paul as trustee for the benefit of David L. Paul's two sons, were substituted as the real parties in interest to the Application for Conversion with the FHLBB.

7. See August 31, 1983 memorandum from Mark Rundle, Regional Director, FHLBB, to Julie Williams, Director, Securities Division, Office of General Counsel, FHLBB. The Rundle memorandum indicates that, based on FSLIC analyses Dade was insolvent on a market basis. Further, the Rundle memorandum concludes that, based on Dade's rate of losses, "Dade will be insolvent [on a book basis] in 3–4 months," and that, given projected higher interest rates, "Dade's insolvency could be sooner..."

(8) Within ninety days ... the Association shall furnish analyses, accompanied by a concurring opinion from its independent accountants ... which (a) specifically describe, as of the date of the completion of the sale of the conversion stock, any intangible assets, including goodwill, or discount of assets arising from the transaction to be recorded on the Association's books, and (b) substantiate the reasonableness of amounts attributed to intangible assets, including goodwill, and the discount of assets and the related amortization periods and methods.

On January 31,1984, Deloitte Haskins & Sells submitted its analysis and opinion pursuant to the Resolution. The analysis concluded that supervisory goodwill arising from the supervisory conversion was $525,609,000, to be amortized on a straight-line basis over twenty-five years.

After the FHLBB resolution, and pursuant to the Plan of Voluntary Supervisory Conversion, Dade was converted into a Florida capital stock association, with all of the stock in the newly constituted Dade distributed to David L. Paul and other Westport shareholders. In return Paul and the other shareholders (though not all Westport shareholders) transferred all of their shares in Westport, as well as all the outstanding shares of AmMart Realty Corp., a corporation wholly-owned by David L. Paul and itself the owner of Westport stock. Dade subsequently changed its name to CenTrust Savings & Loan Association, and ultimately (after an additional name change) became CenTrust Bank, a State Savings Bank. CenTrust was seized by the Office of Thrift Supervision on February 2, 1990.

*Defendant's Motions for Summary Judgment Based on a Special Plea in Fraud*

Defendant has moved against all plaintiffs [8] for summary judgment based on its special plea in fraud counterclaims. The plaintiffs have cross-moved to dismiss the counterclaim, or, in the case of the FDIC, have cross-moved for summary judgment on the

counterclaim. The government's fraud claim is premised significantly on David L. Paul's guilty plea to 29 counts of a 100–count indictment brought by a Federal Grand Jury stemming from his operation of CenTrust Bank, where, in addition to being the controlling shareholder, he served as Chief Executive Officer and Chairman of the Board of Directors. Mr. Paul pled guilty to a variety of federal crimes, including racketeering, conspiracy to defraud the United States government, and multiple counts of making false material entries on the business records of CenTrust Bank.

■ Defendant argues that the admitted criminal activities of David L. Paul mandate the forfeiture of the breach of contract claims of all plaintiffs to the government pursuant to 28 U.S.C. § 2514, which provides:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the United States Court of Federal Claims shall specifically find fraud or attempt and render judgment of forfeiture.

Further, the statute is not confined to the presentment of the claim. As this court has stated previously: "the mandate of the words employed in 28 U.S.C. § 2514 [is] quite clear and unequivocal. The words of the statute make it apparent that a claim against the United States is to be forfeited if fraud is practiced during contract performance." *Supermex, Inc. v. United States,* 35 Fed.Cl. 29, 39–40 (1996). *Supermex* provides an extensive explanation that Court of Federal Claims precedent and the legislative history of the statute all contemplate that a claim shall be forfeited if fraud against the government occurs during contract performance. *Id.* at 39–42.

■ At the same time, it is also clear that the forfeiture statute does not mandate the

---

**8.** Because the court has dismissed the breach of contract claim of Patricia Wallace, the court need not address the government's motion for summary judgment directed against her. In addition, although defendant's motion was directed

against plaintiffs Donald K. Anderson and Angel Cortina, Jr., the motion is moot as it regards them because the court has already dismissed their claims. *See* April 22, 1998 Order, *supra* n. 1.

forfeiture of claims having to do with unrelated transactions. The Court of Claims explained the distinction in *Little v. United States*, 138 Ct.Cl. 773, 778, 152 F.Supp. 84, 87–88 (1957):

> It is true that the forfeiture statute was not intended to forfeit an otherwise valid claim of a claimant merely because, in some other unrelated transaction, he had defrauded the Government. But where, as in the present case, fraud was committed in regard to the very contract upon which suit is brought, this court does not have the right to divide the contract and allow recovery on part of it. Since plaintiff's claims are based entirely upon contract V3020V–241, a contract under which he practiced fraud against the Government, all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514.

The initial, and ultimately critical, inquiry, then, is whether the crimes to which Mr. Paul either pled guilty or of which he was convicted by a jury, and most of which indisputably related to his management of CenTrust Bank, should be considered as fraudulent activities committed during the performance of the contract alleged by plaintiffs, or whether these admittedly criminal actions were unrelated to the contract alleged by plaintiffs. If, as the government claims, the criminal acts to which Mr. Paul admitted can be deemed to be fraudulent activities against the government during the performance of a contract, then some, or all, of the breach of contract claims could be forfeited pursuant to 28 U.S.C. § 2514.

■ This, of course, requires the court to determine the nature and scope of the contract alleged by the plaintiffs. Defendant argues that, assuming the existence of a contract for purposes of the fraud summary judgment motion, the contract cannot be confined to a contract to treat goodwill as regulatory capital in exchange for a capital infusion from Westport shareholders. Rather, it should be considered an offer to recapitalize, purchase and operate Dade, pursuant to the terms of Application for Supervisory Conversion, in exchange for requested regulatory treatment, including the use of the purchase method of accounting to record the transaction and the amortization of goodwill on (as ultimately approved) a 25–year straight-line basis. Plaintiffs, although they disagree on who the parties to the alleged contract were, all contend that the "goodwill" contract has nothing to do with the criminal activities for which Mr. Paul pled guilty and was convicted by a jury.

In determining both the existence of a contract and the scope of such contract, the court is guided by the *Winstar* progeny of cases, culminating with the Supreme Court's decision in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The court is also guided by its comprehensive opinion in *California Fed. Bank v. United States*, 39 Fed.Cl. 753 (1997), and its prior decisions in *Castle v. United States*, 42 Fed.Cl. 859 (1999), *Glass v. United States*, 44 Fed.Cl. 73 (1999) and the analysis used by the Ninth Circuit in *Far West Fed. Bank v. Office of Thrift Supervision*, 119 F.3d 1358 (1997), in determining the scope of the contract.

The court finds that David L. Paul, Dade and FHLBB entered into a contract whereby David Paul would purchase a controlling interest in Dade, partially recapitalize and engineer the additional capitalization of the thrift, and operate the thrift in the manner prescribed in the Supervisory Application and supporting documents. This was given in exchange for particularized regulatory treatment, including permission to use purchase accounting and amortization of the goodwill over twenty-five years. The offer was largely memorialized in the Supervisory Application, its subsequent amendments, and letters provided by Dade's and Westport's accountants to the FHLBB. The offer was accepted by the FHLBB when it approved Resolution 83–549, and the acceptance is memorialized in the Resolution and the Forbearance Letter issued contemporaneously with the Resolution. Plaintiffs have provided ample evidence that, far from being a regulatory rubber stamp, this was an agreement that was negotiated over a long period of time, and which was carefully considered and reviewed by regulators. Moreover, regulators recognized that this offer, to engineer the rebound of a thrift that was a superviso-

ry problem and which might have to be seized in a manner of months, provided a solution to a potentially very costly problem with no cash outlay required by the federal government.[9]

At the same time, it is equally clear, based on the offer made by Dade and David L. Paul, the FHLBB resolution, and the FHLBB documents upon which the plaintiffs rely in showing that this was a bargained-for exchange for consideration, that, critical to the FHLBB was the viability of the converted thrift and the integrity of those who would run it. Federal regulators granted the promises regarding goodwill because they believed that the proposal brought to them would resolve a supervisory problem. Essential to their decision-making was the viability of the plan to convert, capitalize, and operate the bank, and central to that was the integrity of the new management, in particular Mr. Paul. To read the contract as encompassing only a capital infusion in exchange for the amortization of goodwill is an incomplete reading of the bargain made. That promise carried with it obligations by the new management, most particularly Mr. Paul, as memorialized in the Supervisory Application, and documents incorporated by reference therein, to operate the thrift in a safe and sound manner.

Viewed in this way, the next question for the court to resolve is whether the criminal acts to which Mr. Paul pled guilty, as well as any other fraudulent activities asserted by defendant, prove by clear and convincing evidence that a fraud has been committed against the United States in the performance of the contract, thus requiring forfeiture of the parties' claims.

 The court finds that, as regards the breach of contract claims of David L. Paul, based solely on the crimes to which he pled guilty (and without regard to the 69 crimes for which he was convicted by a Federal Jury), Mr. Paul's fraudulent activities were so pervasive, and many related directly to the contract at issue, that his breach of contract claims must be forfeited to the United States pursuant to 28 U.S.C. § 2514. Plaintiffs characterize the crimes as being directed at CenTrust, and unrelated to the contract. No doubt these crimes were directed against CenTrust, but it is also beyond cavil that they were related to plaintiff Paul's obligations to run the thrift in a safe and sound manner per the contract. Indeed, as defendant demonstrates, and by Mr. Paul's own admission, several of the actions that were the bases of his guilty plea were fraudulent acts directed toward the regulators to conceal certain activities in which the thrift was engaged.

In his "Factual Basis for Change of Plea," which counsel for Mr. Paul submitted in support his guilty plea to 29 of the 100 counts of his indictment, counsel for Mr. Paul stated the following:

2. As part of CenTrust's efforts to obtain regulatory approval for this offering [a May 1988 subordinated debenture], Paul

---

9. Within this framework, the trust operating for the benefit of David L. Paul's two sons, David Joshua and Michael M. Paul, is best considered a third-party beneficiary of the deal, since it was designed, at least in part, to induce the trust to convey its Westport interest in exchange for shares of Dade. Although the Paul children contend that they—or, more accurately, the trust— were parties to the contract, it is apparent in reviewing the documents that form the contract that the deal was designed to deliver control of Dade to David L. Paul, subject to certain regulatory treatment in exchange for his substantial Westport assets. Mr. Paul, directly and through AmMart Realty Corporation, owned just under 75 percent of Westport. It was he, rather than the Trust for the Paul children, that orchestrated the transaction, and it is the person with whom the government believed it was contracting. While the Pauls did substitute themselves for Westport as the real parties in interest to the Reorganization and Purchase Agreement with Dade, this does not mean that they were parties to the contract with the government. This is buttressed by the fact that the FHLBB internal documents refer to the transaction in terms of the acquisition of Dade by David L. Paul, and analyze the deal in those terms. In fact, even after the Paul trust, along with David L. Paul, were substituted as the real parties in interest to the agreement with Dade, the proposed supervisory acquisition is reviewed in terms of an acquisition by David L. Paul or the Westport Company. There is no evidence that the government believed it was entering a contract with the Paul trust. At the same time, it is clear that the regulators also recognized that additional minority shareholders of Westport, including the Paul trust, may add their capital to Dade were the acquisition and conversion approved.

and others willfully represented to officials of Washington FHLBB that, based on the preliminary marketing efforts in April of 1988, Centrust, through its underwriters, has received indications that up to $230,000,000 of the subordinated debentures could be sold.

3. Paul knew at the time, however, that there was no indication that specific prospective institutional investors were prepared to purchase up to $230 million.

The same document also states that "Paul and others knowingly caused the false entry charged in Count 12 of the indictment to be made in the records of CenTrust. This entry was known by Paul to be false." Count 12 states:

David L. Paul, and William Christopher Berry, being officers, agents of and connected in certain capacities with CenTrust, did, with intent to defraud CenTrust and to deceive auditors of CenTrust and examiners of the FHLBB, knowingly and willfully make and cause to be made a false entry as to material fact in the books, reports, and statements of and to Cen-Trust Bank, in that defendants Paul and Berry caused to be prepared and submitted to CenTrust a letter agreement with Drexel which identified the June 13, 1988, purchaser of 2,735,000 shares of Playtex Corporation common stock from CenTrust only as the "Ultimate Purchaser" and otherwise created the false impression that CenTrust did not know who was acquiring its Playtex stock, whereas, as defendant's Paul and Berry well knew, the purchaser of the stock was to be [American Continental Corporation].

Moreover, Mr. Paul pled guilty to Counts 3–6 of the Superceding Indictment, which states:

4. It was part of said scheme that defendant's Paul and Pharaon would seek to expand CenTrust through the generation and receipt of substantial additional federally-insured deposits, and would use misrepresentations and deception to do so.

5. It was further part of the said scheme that defendants Paul and Pharaon would seek to have the FHLBB approve, prior to their May, 1988 issuance, the subordinated debentures as part of CenTrust's "regulatory capital" base . . .

6. It was further part of the scheme that defendants Paul and Pharaon would make false and misleading statements to the FHLBB in order to procure the FHLBB's approval of CenTrust's application to include the proceeds of the offering as part of CenTrust's regulatory capital base.

The Paul plaintiffs argue that Mr. Paul's guilty plea was premised only upon the facts contained in the Factual Basis for Change of Plea, and that, hence, plaintiff does not admit to any of the alleged fraudulent acts contained in the Superceding Indictment. There is no doubt, though, that, even limited to the Factual Basis for Change of Plea, Mr. Paul specifically admits to actions that defrauded the United States, including the FHLBB. These actions are directly related to Mr. Paul's obligations, both as a direct contracting party and as the controlling shareholder, Chief Executive Officer and Chairman of the Board of Directors of Cen-Trust, to operate the thrift in a safe and sound manner.

Mr. Paul's was convicted of 68 of the 69 counts to which he did not plead guilty. These, in addition to those to which he pled guilty, establish, with clear and convincing evidence, that Mr. Paul engaged in activities directed at the United States, the party with which he contracted to own and operate Cen-Trust. That the myriad fraudulent and other illegal activities that he engaged in did not specifically deal with the goodwill promise is of no moment. The government expected Mr. Paul to operate the thrift in a manner that ensured its viability and resolved a potential problem for the insurance fund. In short, it had reason to expect, pursuant to the contract, that Mr. Paul would operate the thrift in a manner that ensured its viability. In addition, while there is of course no doubt that many of the actions taken by Mr. Paul harmed the thrift, many of the fraudulent actions were directed against bank regulators, often in an effort to obscure ongoing criminal activity. Still, these were clearly fraudulent and relevant to Mr. Paul's con-

tract with regulators to purchase and run CenTrust.[10]

Defendant also argues that the criminal and fraudulent convictions of Mr. Paul and Donald K. Anderson, a former name plaintiff in this action and a former senior officer of CenTrust, should be imputed to the FDIC, which has brought suit in intervention on behalf of the CenTrust receivership. Defendant points out that the FDIC steps into the shoes of the failed institution for the purpose of this litigation. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). As such, under the law of this circuit, "a corporation can act only through its officers and agents, and when they are clothed with the authority to act for it, the corporation is responsible for their acts." *Wagner Iron Works v. United States*, 146 Ct.Cl. 334, 337–38, 174 F.Supp. 956, 958 (1959). In this instance, defendant points out that, at all relevant times, David L. Paul was not just an officer "clothed with the authority to act;" he, as CEO, Chairman of the Board and majority shareholder, in effect, controlled CenTrust. Moreover, Donald K. Anderson, was a significant shareholder and, from July 1984 until September 1987, a senior officer of CenTrust.

In addition, the Court of Claims has addressed the applicability of the forfeiture statute and found that a receiver is not immune from the government's special plea in fraud. *See, Jerman v. United States*, 96 Ct.Cl. 540, 553, 1942 WL 4439 (1942); and *Goggin v. United States*, 138 Ct.Cl. 279, 152 F.Supp. 78, 79 (1957). While the FDIC recognizes this rule, the FDIC also asks the court "to modify the rulings in *Jerman* and *Goggin* to permit a receiver to go forward with a contract claim against the United States where the receiver's recovery will not

benefit the wrongdoer." This is apparently the case because the FDIC owns the claim of Donald Anderson and because there are outstanding, and unpaid, forfeiture orders against Mr. Paul in excess of $100 million.

Although the FDIC has made a strong argument, the court declines to ignore *Jerman* and *Goggin*. Mr. Paul's pervasive fraudulent activities are attributable to the thrift and, since the FDIC steps into the shoes of the thrift, it is liable, in its capacity here as a receiver, for the actions taken by Mr. Paul. Likewise, the court declines to adopt the adverse interest exception suggested by the FDIC. The adverse interest exception to the general rule of imputation provides that the acts of corporate officers and agents are not imputed to the corporation if the acts are adverse to the corporation's interests and the corporation does not benefit. The court declines to adopt the rule, for two reasons. First, this circuit has not traditionally recognized the exception. Second, and more importantly, although some of the criminal acts were done to benefit Mr. Paul personally, other fraudulent acts, including lying to federal banking regulators, were done ostensibly to advance the criminal schemes being carried out to benefit the bank.[11]

## CONCLUSION

The court grants defendant's motion to dismiss the breach of contract claims of Patricia Wallace for lack of standing pursuant to RCFC 12(b)(1). The court concludes that there was a contract entered into between David L. Paul, Dade, and the FHLBB permitting the conversion and purchase of Dade in exchange for certain regulatory treatment for the thrift. The court concludes further that David Joshua Paul and

10. In addition, as defendant points out, all government contracts include an implied covenant of good faith and fair dealing. David L. Paul's criminal admissions, at a minimum, have violated the covenant of good faith and fair dealing with its contracting partner the government.

11. In addition, defendant makes an excellent point regarding the mixed motivation of the FDIC in this case. Defendant states: "It is disingenuous for the FDIC–R to secure a judgment in a professional liability action upon the ground

that, through blatant mismanagement, the CenTrust Bank Board of Directors caused the demise of the failed institution and, then, turn around and pursue a collateral action against the United States Government upon the ground that CenTrust Bank failed as a direct result of the enactment of FIRREA." Were the court inclined to grant the adverse interest exception, it would have to be a case where the interests of the litigant, the FDIC, were not this confused.

Michael Morgan Paul were third-party beneficiaries to the contract between David L. Paul, Dade, and the FHLBB. Nonetheless, the court grants defendant's motion for summary judgment based on the special plea in fraud pursuant to 28 U.S.C. § 2514 against David L. Paul and the Federal Deposit Insurance Corporation on their claims for breach of contract. The court also grants defendant's motion for summary judgment against plaintiffs David Joshua Paul and Michael Morgan Paul on the ground that, as third-party beneficiaries to the contract, they cannot sue to enforce the goodwill promise, since the underlying breach of contract actions have been forfeited because of the fraudulent activities of David L. Paul.

The court has not addressed the non-contract-related claims of plaintiffs. The court proposes that the parties file status reports within 30 days of this opinion proposing a schedule for further proceedings if necessary.

**IT IS SO ORDERED.**