**AMERICAN HERITAGE BANCORP,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

**No. 90–3982C.**

United States Court of Federal Claims.

July 23, 2004.

---

Daniel J. Goldberg, Washington, DC, for plaintiff. Paul W. Grace, of counsel.

John. H. Roberson, U.S. Department of Justice, Washington, DC, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, and Director David M. Cohen, for defendant. John N. Kane, Jr., of counsel.

## OPINION

FIRESTONE, Judge.

This matter comes before the court on the parties' cross-motions for summary judgment. In this *Winstar*-related case, the plaintiff, American Heritage Bancorp ("AHB"), has sued the United States (the "government") for breach of contract in connection with AHB's agreement to purchase Home Federal Savings Bank in Massachusetts ("Home"). AHB claims that, due to the government's breach, it suffered damages in excess of $14 million. The government argues that AHB's action should be forfeited under the Forfeiture of Fraudulent Claims statute, 28 U.S.C. § 2514, and has moved for summary judgment, pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").

In its April 9, 2003 Summary Judgment Motion, the government contends that AHB, through one of its directors, Sumner Gladstone, induced the government to enter the contract to acquire Home by fraudulently misstating his financial position in AHB's acquisition application to the Federal Home Loan Bank of Boston (the "FHLB of Boston"), the governmental body responsible for approving AHB's acquisition of Home. In response, on November 7, 2003, the plaintiff cross-moved for summary judgment on the ground that the government cannot prove, by clear and convincing evidence, that AHB fraudulently induced the government into entering the contract. For the reasons set

forth below, the court **GRANTS** the government's Cross Motion for Summary Judgment and **DENIES** the plaintiff's Cross Motion for Summary Judgment.

## BACKGROUND

### A. Litigation History

This case was previously before the court on AHB's motion to dismiss the government's Forfeiture of Fraudulent Claims defense. The background history of that litigation is set forth in the earlier decision and will not be repeated here. *See American Heritage Bancorp v. United States*, 56 Fed. Cl. 596 (2003) (*"American Heritage I"*). In that decision the court granted in part and denied in part AHB's motion to dismiss. The court held that the government had alleged sufficient facts to proceed with its claim for forfeiture in connection with the actions of AHB in acquiring Home. The court further held that the government had failed to allege sufficient facts to support forfeiture based on the actions of Mr. Gladstone and others in managing Home. In particular, the court held that the government had stated a claim for fraud based on the false statements made by Mr. Gladstone on the application he filed on behalf of AHB for the acquisition of Home. The court also found that the government had alleged sufficient facts to support the imputation of Mr. Gladstone's fraud to AHB. With respect to the government's claim of forfeiture based on Mr. Gladstone's and other officers' management of Home, the court held that the allegations of Mr. Gladstone's self-dealing and receipt of kickbacks during his tenure as an officer and director of Home were, if proven, sufficient to establish fraud, but that the government had not alleged sufficient facts to allow the court to impute Mr. Gladstone's actions as an officer and director of Home to AHB.

As part of that earlier decision the court also noted that AHB's investors were involved in an earlier lawsuit with the Resolution Trust Corporation (the "RTC") which raised some of the issues involved in this case. On June 7, 1993, the RTC filed a civil action against Mr. Gladstone and AHB's other investors, seeking damages in connection with Home's poor lending operations. The RTC asserted fraud claims against Mr. Gladstone, including allegations of self-dealing and the receipt of kickbacks. The RTC also noted that Mr. Gladstone had not been truthful in his submissions to the Federal Home Loan Bank Board (the "FHLBB"). Many of the facts underlying the government's present action were developed in connection with that earlier litigation. *See Resolution Trust Corp. v. Gladstone*, 895 F.Supp. 356 (D.Mass. 1995). The RTC litigation resulted in a settlement. Although AHB was not a party to the RTC litigation, it was a party to the settlement. The settlement agreement provided that AHB would reimburse the government a percentage of any judgment in the event it prevailed in the pending litigation. The settlement agreement also stated, however, that the settlement would not have a collateral effect on the present pending action. In particular, the settlement agreement stated:

> Notwithstanding anything herein to the contrary, the Agreement and the resolution of FDIC's claims in the Home Federal [Director and Officer] Action is intended by the parties hereto to have no effect on and be without prejudice to the rights, liabilities, claims, defenses or causes of action of any of the signatories hereto with respect to the AHB litigation.

Def.App. at 1167.

The AHB litigation referred to in this passage is the present action.

### B. AHB's Acquisition of Home

The following facts, unless otherwise noted, are undisputed. AHB is a Massachusetts corporation that was organized in order to acquire Home, a failing financial institution, in Massachusetts. AHB originally was composed of four investors, namely Mr. Gladstone, Anthony Delapa, James Derderian, and Mario DiCarlo (the "Investors"). In June 1985, AHB entered into an Agreement and Plan of Merger with Home, which was ratified by Home's Board of Directors in August 1985.

In August 1985, AHB filed an H-(e)1 Application with the FHLB of Boston for the acquisition and control of Home. The H-(e)1

Application was required pursuant to Section 408(e)(1)(B) of the National Housing Act and Section 584.4(b) of the Regulations for Savings and Loan Holding Companies. The H-(e)1 Application included a description of the proposed acquisition and the names and relative shareholdings of the Investors. Mr. Gladstone was identified as president and 38.6% owner of AHB.

As part of its application to acquire Home, each of the Investors submitted Biographical and Financial Reports using FHLBB Form 660. These reports were mandatory and clearly stated that "all questions must be answered in full," and that "any misrepresentations or omission of a material fact may subject the individual to legal sanctions." Def.App. at 26. The form also directed applicants to Sections 1001, 1008, and 1014 of Title 18 of the United States Code. Def.App. at 49. Section 1001, for instance, makes it unlawful for anyone, *inter alia*, to "knowingly and willfully make[ ] any materially false, fictitious or fraudulent statement or representation ... in any matter within the jurisdiction of ... the Government of the United States." 18 U.S.C. § 1001 (2004). Section 1014 provides for imprisonment for up to thirty years for "knowingly mak[ing] any false statement or report, or willfully overvalu[ing] any land, property or security, for the purpose of influencing in any way the action" of certain federal employees. 18 U.S.C. § 1014 (2004). Section 1008, which has been repealed by Pub.L. 101–73, Title IX, § 961(g)(1) (1989), was similar to these other statutes in scope and effect.

In this connection, it is not disputed that, in several documents, AHB and Mr. Glad-

stone warranted that Mr. Gladstone's submissions to bank regulators, including his Statements of Financial Condition, were accurate. In the H-(e)1 Application itself, Mr. Gladstone, signing as President of AHB, warranted that AHB's application was "true and correct to the best of his knowledge and belief." H-(e)1 Application, Def.App. at 19. In his personal Biographical and Financial Report, filed as an appendix to the H-(e)1 Application, Mr. Gladstone, signing as President and Director of AHB, represented and warranted that the information contained in the report was "true, correct and complete." Biographical and Financial Report from Gladstone to FHLB of Boston of 10/28/85, Def.App. at 49. As part of that report, Mr. Gladstone represented that he owned 100% of Gladstone Brothers, which he valued to be worth $22,817,689.[1] Mr. Gladstone also represented on his financial form that he had real estate and other assets, including a residence in Chelmsford, Massachusetts valued at $250,000 and land and a building in Laconia, New Hampshire valued at $145,000. Mr. Gladstone claimed on his financial statement that he had a net worth of over $26 million.

During the course of its review of the application, government regulators discovered that Mr. Gladstone had not fully disclosed that he been the subject of legal proceedings for alleged violations of Massachusetts bank regulations in two instances.[2] This failure to disclose led the regulators to require AHB to submit an amended H-(e)1 application. The regulators also asked Mr. Gladstone for more detail regarding the representations he had made on his Financial Disclosure Report.

---

1. At the May 28, 2004 oral argument on the cross-motions, AHB conceded that the December 1, 1984 Statement of Financial Condition that Mr. Gladstone later submitted to the FHLB of Boston was the basis for the October 1985 Financial Report. AHB abandoned its contention that the 1985 Financial Report was not related to the 1984 Statement of Financial Condition. AHB accepted that the $2 million discrepancy between the two documents was accounted for by changes in the value of stock. AHB agreed with the government that Mr. Gladstone acknowledged that certain liquid securities listed in the 1985 Financial Report had declined by $2 million. Trans. of May 28, 2004 at 21.

2. Eventually, the regulators also learned that Mr. Gladstone had failed to disclose certain criminal violations. Mr. Gladstone had pled no contest to four separate criminal misdemeanor counts of providing illegal gifts to building inspectors. AHB reported the violations on its amended application. Mr. Gladstone's criminal violations would have been a "presumptive disqualifier" under the FHLBB's new Acquisition of Control regulations. 12 C.F.R. § 574. However, because AHB's application had been filed before the new regulations took effect, its application was grand-fathered in under earlier regulations. As a consequence, the regulators were able to overlook AHB's failure to initially disclose Mr. Gladstone's prior legal troubles.

Ford Peckham, Supervisory Agent for the FHLB of Boston, noted in a memorandum that he specifically asked Mr. Gladstone for more detail regarding his Gladstone Brothers holdings:

> As part of the review of the application to take over Home Federal Savings Bank, I wanted to personally interview of the principals. On August 12, 1985, Mr. Gladstone came in ... and we discussed the application and his background for about an hour. Mr. Gladstone is the unifying force behind the application.... In response to a question with respect to the capital situation ... [h]e claims to have $3–4 million in cash in the company (Gladstone Brothers) name. A statement of Gladstone Brothers[' net worth] was not included with the Financial and Biographical Reports. The reason given was fear that Gladstone Brothers would be deemed to be a savings and loan holding company. I asked for the statement to support Mr. Gladstone's net worth and cash resources.

Internal Memorandum by Peckham of August 12, 1985, Def.App. 1643.

Apparently in response to this request, Mr. Gladstone provided the regulators with a copy of his December 1, 1984 Statement of Financial Condition (the "1984 Statement").[3] In the 1984 Statement, Mr. Gladstone indicated that he held the vast majority of his assets in real estate. Def.App. at 2335. In particular, Mr. Gladstone represented on the 1984 Statement, as he had on the financial statement he certified to the government, that he was the 100% owner of Gladstone Brothers, which in turn had a net worth of over $24 million. Mr. Gladstone included with his 1984 Statement an itemized list of the properties that he purportedly owned, through Gladstone Brothers, along with the values of those properties as of the date of the 1984 Statement. Mr. Gladstone also included his personal real estate holdings on his 1984 Statement.

The real estate assets listed by Mr. Gladstone doing business as Gladstone Brothers in the 1984 Statement included almost two dozen properties in New Hampshire and Massachusetts. There is no dispute that Gladstone Brothers was only a trade name and that Mr. Gladstone did not own any of the properties in his own name or in the name of "Gladstone Brothers." Instead, all of the properties were owned by separate entities. It is not disputed that Mr. Gladstone had an interest in some of the entities that owned properties listed on his 1984 Statement. However, as discussed below, it is also not disputed that the following properties identified by Mr. Gladstone on his 1984 Statement were not owned by an entity either owned by Mr. Gladstone or Gladstone Brothers: Rt. 28 Bypass, Hooksett, NH; 420 Common Street, Lawrence, MA; 363 Huse Road, Manchester, NH, listed as Land; Huse Road, Manchester, NH, listed as Real Estate; East Industrial Park Drive, Manchester, NH, listed as Land; and East Industrial Park, Manchester, NH, listed as Real Estate. Def.App. at 2336–37. These properties were also listed on Mr. Gladstone's certified submission to the government regulators in support of AHB's application to acquire Home. In addition, it is not disputed that Mr. Gladstone did not own the property identified in Chelmsford, MA or in Lanconia, NH, as Mr. Gladstone represented to the government.

---

**3.** In its Proposed Finding of Uncontroverted Fact No. 42, the plaintiff suggests that there is no proof that the FHLB of Boston ever received a copy of the 1984 Statement. Therefore, AHB seems to suggest that any fraudulent statements contained in this statement should not be considered to have been made to the government. However, the plaintiff does not dispute that Mr. Peckham, Supervisory Agent for the FHLB of Boston, prepared a memorandum in which he referenced figures only found in the 1984 Statement. As discussed above, Mr. Peckham described Mr. Gladstone's proprietorship as being worth "$24 million and includes $5.8 million in cash and $1.8 million in marketable securities." Internal Memorandum of Peckham, Supervisory Agency, FHLB of Boston, Def.App. at 383. These are the precise figures contained in the 1984 Statement. Therefore, although the plaintiff acknowledges in its Reply Brief that it is not objecting to the court's consideration of the 1984 Statement, to the extent that there is a dispute as to whether the 1984 Statement was received by the government, the court finds, in light of the undisputed evidence, that the FHLB of Boston was in receipt of the 1984 Statement at the time of the approval of the AHB–Home merger. *See* Pl. Reply at 8, n.8 ("AHB does not have a serious objection to the Court's consideration of the December 1984 financial statement.").

### 1. Rt. 28 Bypass

The property known as Rt. 28 Bypass was owned by a trust called Conrad Realty Trust ("Conrad"). Plaintiff does not dispute this fact. *See* Plaintiff's Reply Brief in Support of its Cross Motion for Summary Judgment ("Pl.Reply") at 24. Conrad was created in July 1984. According to AHB, the Rt. 28 Bypass Property was transferred by Conrad Croteau to Jay and Gary Gladstone, Mr. Gladstone's sons, in July 1984. In a 1991 deposition, Mr. Gladstone admitted that he had no beneficial interest in Conrad. Deposition of Gladstone, October 17, 1991 ("1991 Deposition"), Def.App. at 292–93.[4] Mr. Gladstone, when deposed, gave the following testimony about his interest in Conrad:

> Q: Is it your statement that you do not have any interest in Conrad Realty Trust?
>
> A: I don't have any beneficial interest.

1991 Deposition, Def.App. at 293.[5]

Mr. Gladstone confirmed this view in a 1995 deposition. In response to a question asking whether he had an interest in an entity called Conrad Realty Trust, Mr. Gladstone stated, "Not to the best of my knowledge." Deposition of Gladstone, September 11, 1995 ("1995 Deposition"), Def.App. at 2380–80.1.

The plaintiff does not offer any documentation to show that Mr. Gladstone had any interest in the property owned by Conrad. The plaintiff values this property as of the time of the 1984 Statement at $180,000, after deducting the value of the mortgage that this property carried.

### 2. 420 Common Street

420 Common Street was a commercial office building owned by the Hampshire Realty Trust. In a 1995 deposition, Mr. Gladstone admitted that, although it appeared on his 1984 Statement, in fact he sold this property between 1980 and 1983 to another company in which Mr. Gladstone had no ownership interest. 1995 Deposition, Def.App. at 2378–79. In his 1995 Deposition, Mr. Gladstone declared the following with regard to his interest in 420 Common Street:

> A: The building was sold several years ago.
>
> Q: Do you remember exactly when?
>
> A: No.
>
> Q: Was it in the 1990s?
>
> A: No. It was way back, Fifteen years ago. Twelve to fifteen years ago. At least twelve years ago.
>
> Q: Do you know to whom the building was sold?
>
> A: Yes, I do.
>
> Q: To whom was it sold?
>
> A: Junk Realty Trust.
>
> Q: Junk?
>
> A: Realty Trust.
>
> Q: Do you have any type of ownership interest in Junk Realty Trust?
>
> A: No.

1995 Deposition, Def.App. at 2378–79.

The plaintiff does not dispute the fact that Mr. Gladstone sold 420 Common Street before December 1984 but still included it on his 1984 Statement. AHB argues that this was not improper because although the property was sold in 1992, the deed to 420 Common Street was not recorded until 1985. AHB argues that the deed was likely placed in escrow pending satisfaction of some condition that may have been related to the property. AHB argues that as a matter of law, Mr. Gladstone could include the property on

---

4. The government and AHB rely extensively on depositions of Mr. Gladstone taken in other cases. Several depositions were taken in actions by creditors against Mr. Gladstone. These include depositions in: *Nationsbank of Florida v. Whitney Lakes Development,* No. 91–6191–13 (Fla.Cir.Ct.), Deposition of September 11, 1995; *In the Matter of Gladstone, Cain and Delapa,* No. AP–91–62, 63, 64, Deposition of January 16, 1992; *Florida State Bank v. Gladstone,* No. 91–820–17 (Fla.Cir.Ct.), Deposition of October 17, 1991; *Goldome Savings Bank v. Gladstone,* No. 90–16441–18 (Fla. Cir Ct.), Deposition of June 21, 1991.

5. AHB noted that Mr. Gladstone went on to say in the above-quoted transcript that he did not have an interest in Conrad Realty Trust in "the last 2 years." AHB indicated that this implied that Mr. Gladstone may have had an interest before then. There is no basis for AHB's argument. There is no evidence to suggest that Mr. Gladstone had any interest in Conrad Realty Trust at any time.

his financial forms until the deed was recorded. The plaintiff values 420 Common Street at $535,000 at the time of the 1984 Statement.

### 3. Huse Road Properties

Mr. Gladstone listed the Huse Road Properties on his 1984 Statement. It is not disputed that Mr. Gladstone deeded the Huse Road properties to Garjay Construction Co., Inc. ("Garjay") in 1982. Pl. Reply at 18. Garjay was incorporated by three of Mr. Gladstone's children, Gary, Jay, and Sandra, in 1982. AHB has presented evidence to show that Mr. Gladstone was the General Manager of Garjay, but has not presented any evidence to show that either Gladstone Brothers or Mr. Gladstone himself *owned* the properties. Mr. Gladstone admitted both in the 1995 Deposition and a 1991 deposition that he owned no interest in Garjay. In the 1995 Deposition, Mr. Gladstone gave the following statement regarding Garjay:

Q: Did you have an ownership interest in Gar–Jay [sic]?

A: I'm going to say no, I did not.

1995 Deposition, Def.App. at 2376.1.

In a deposition taken on June 21, 1991, Mr. Gladstone responded to a question about the ownership of the Park View Hills Condominiums [6] by stating: "That's Garjay." When asked "I think you have an ownership interest in Garjay, but no stock has been issued?" Mr. Gladstone answered in the affirmative. Deposition of June 21, 1991, Def.App. at 318. AHB takes this as an indication that Mr. Gladstone owns an interest in the Huse Road Properties.

Mr. Gladstone also stated, in response to a question regarding numerous properties, including the "Camelot Court condominiums property, Roper Estates condominiums property, the Mitchell Estates condominiums property, the Border Brook condominiums property ... and the Park View Hills condominiums," that although he did not own the properties in his individual capacity, the properties were "either owned or controlled by me. ... Maybe it was not under the name Sumner Gladstone, but I owned the

entity a hundred percent." AHB App. at 290–92. In addition, the plaintiff notes that the FDIC identified Garjay as a "related-interest" of Mr. Gladstone. The plaintiff does not, however, present any evidence that calls into doubt the fact that the Huse Properties were titled to Garjay and that Mr. Gladstone was neither a principal nor a stockholder of Garjay. The plaintiff values the property owned by Garjay at $2.5 million, after taking into account a mortgage encumbering the properties.

### 4. East Industrial Park Properties

Both East Industrial Park and East Industrial Park Drive (the "East Industrial Park Properties") were titled to East Industrial Park, Inc. The East Industrial Park Properties, in turn, were owned as of December 1, 1984 by Mr. Gladstone's children, Gary, Jay, and Sandra. They were listed as the officers and directors. No stock was issued. Mr. Gladstone was identified as the "General Manager" of the East Industrial Park Properties and had the authority to execute condominium unit deeds. Mr. Gladstone testified at a deposition that he believed that the East Industrial Park Properties were owned by the Conrad Realty Trust, another entity controlled by Gary and Jay Gladstone.

The plaintiff notes that the East Industrial Park Properties were included in the list of properties that Mr. Gladstone claimed in a deposition that he owned "a hundred percent." Several of the properties on the list were owned by entities that Mr. Gladstone in fact owned or controlled. It is not disputed however that the East Industrial Park Properties were owned by East Industrial Park, Inc. and that Mr. Gladstone was only the "General Manager" of the entity. The plaintiff valued the East Industrial Park Properties at $1 million.

### 5. Chelmsford, Massachusetts and Lanconia, New Hampshire Properties

As noted above, Mr. Gladstone also identified certain personal real estate holdings on his submission to the FHLBB. In particular, Mr. Gladstone claimed that he owned a

---

**6.** It is not disputed that the Huse Road Proper-

ties include the Park View Hills Condominiums.

residence in Chelmsford, Massachusetts worth $250,000 and land and a building in Lanconia, New Hampshire worth $145,000. It is not disputed that the listed properties were owned at the time of Mr. Gladstone's submission by the C.A.G. Family Trust. Mr. Gladstone testified in a deposition that he did not have any interest in the properties:

Q: At the time of [the American Heritage Application] did you have any interest in a residence in Chelmsford, Mass. that was acquired in 1967?

A: No.

. . .

Q: At the time of the American Heritage application, did you own land and buildings or a building in Lanconia, New Hampshire?

A: No.

Deposition of January 16, 1992 ("1992 Deposition"), Def.App. at 2559–60.

Mr. Gladstone went on to testify that he understood that the property was owned, in trust, by Carol Gladstone, who was by then his ex-wife. *Id.* at 2562. AHB contends that under state law the properties were part of the "marital estate" and so, as a matter of law, Mr. Gladstone had the right to claim ownership of these properties.

## C. The Government Relied on Mr. Gladstone's Submissions

It is clear from all of the internal memoranda prepared by the regulators that the FHLB of Boston regulators considered and relied upon Mr. Gladstone's 1985 Financial Report that identified his 100% ownership of Gladstone Brothers, as well as Mr. Gladstone's 1984 Statement before they approved AHB's acquisition of Home. For example, in the memorandum Mr. Peckham submitted to his superiors recommending that the FHLB of Boston approve the AHB transaction, Peckham states: "Sumner Gladstone is the keystone of this group in terms of financial strength, amount of investment and overall leadership. His business vehicle is Gladstone Brothers. Net worth of this proprietorship approximates $24 million and includes $5.8 million in cash and $1.8 million in marketable securities." Def.App. at 383.

The same information is repeated in the memorandum from the FHLBB's Office of General Counsel to the Office of Examinations and Supervision regarding whether the FHLBB had the legal authority to approve AHB's application: "Mr. Gladstone, age 63, is president of Gladstone Brothers Inc. . . . As disclosed in the subject acquisition application, net worth of this proprietorship is currently approximately $24 million." Def. App. at 1370. The $24 million figure is taken directly from the 1984 Statement.

In 1986, based on the representations made by Mr. Gladstone and others, the FHLBB approved AHB's acquisition of Home. Home began to suffer serious financial loses shortly after AHB's acquisition. Following the enactment of FIRREA, bank regulators concluded that AHB was no longer viable. In June 1990, the Office of Thrift Supervision ("OTS") placed Home into receivership and named the RTC as receiver.

## D. The Present Motions for Summary Judgment

After the errors in Mr. Gladstone's submissions to the FHLBB came to light during the RTC litigation, the bank regulators who were responsible for reviewing and approving AHB's application for the acquisition of Home expressed the opinion that Mr. Gladstone's misstatements regarding the assets of Gladstone Brothers, in addition to other misstatements in his Financial Statement, had influenced their decision to allow AHB to acquire Home. Raymond Elliot, who was the Principal Supervisory Agent at the FHLB of Boston when AHB's application was pending, declared that the "financial condition of AHB's shareholders was a critical component in my assessment that AHB was a viable candidate to acquire Home. . . . Moreover, the honesty and integrity of the acquirers was a fundamental concern that I, and other regulators, had in approving the acquisition of any institution, such as Home. . . . I consider the submission of false and misleading information to FHLBB, especially the type submitted by AHB, to be a serious impropriety and sufficient cause alone for recommending the rejection of an applicant." Declaration of Elliot, 7/18/2002,

Def.App. at 23. Mr. Elliot explained in his declaration that "Mr. Gladstone's testimony and records concerning Gladstone Brothers Corporation indicate significant uncertainties to me now concerning the vehicles through which he conducted business, including most importantly, the viability and financial status of Gladstone Brothers Corporation, which constituted the vast majority of his stated financial resources." Def.App. at 22. These sentiments were shared by the other bank regulators responsible for reviewing and approving AHB's application to acquire Home, including: Ralph Gridley, Supervisory Agent for the FHLB of Boston during the pendency of AHB's application, Def.App. at 181–83; Mr. Peckham, who initially reviewed AHB's application for the FHLB of Boston, Def.App. at 188; Peter Shaw, Supervisory Agent for the FHLB of Boston during the pendency of AHB's application, Def.App. at 193; and Paul Webber, Thrift Supervisor for the FHLB of Boston during the pendency of AHB's application, Def.App. at 198.

The government relies upon these statements in its motion for summary judgment. The plaintiff has not presented any evidence to contradict the statements of reliance by these regulators. AHB deposed only Mr. Elliot. AHB has not contested in any way the declarations of Messrs. Peckham, Shaw and Webber. With respect to Mr. Elliot, it has not contested his statement that, if he had received negative recommendations from Messrs. Peckham, Shaw and Webber, then he would not have recommended approval of the acquisition.

Based on these declarations and the undisputed facts set forth above,[7] the government has moved for summary judgment pursuant to the Forfeiture of Fraudulent Claims stat-

ute, 28 U.S.C. § 2514. The government contends that because Mr. Gladstone's fraudulent statements were made on behalf of AHB as its president and principal architect, the fraud is lawfully imputed to AHB.

AHB, in its own motion for summary judgment, contends that the government has not and cannot prove, by clear and convincing evidence, that Mr. Gladstone made fraudulent statements on his 1985 Financial Report to the FHLBB. The plaintiff presents evidence to show that Mr. Gladstone was in fact the owner of many of the properties identified on his 1984 Statement. Further, the plaintiff argues that even if Mr. Gladstone did make fraudulent statements, those statements were not materially false in that Mr. Gladstone had, in fact, sufficient resources to support the application despite his false statements. In this regard, the plaintiff contends that the government has not established the level of "materiality" necessary to support forfeiture of its entire claim under the Forfeiture of Fraudulent Claims statute.

Oral argument was heard on May 28, 2004.

## DISCUSSION

### A. Jurisdiction and Standard of Review

The government has alleged an affirmative defense to the plaintiff's breach of contract action. The Forfeiture of Fraudulent Claims statute provides that "a claim against the United States shall be forfeited ... by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof." 28 U.S.C. § 2514 (2004). It is not disputed that the court has

---

7. The government challenges numerous items in Mr. Gladstone's 1984 Financial Statement, including representations regarding properties allegedly owned by: Camelot Court Realty Co.; Sea and Wharves, Inc.; Roper Estates, Inc.; East Industrial Park, Inc.; and Sandrag Construction Co. AHB has raised issues with regard to Mr. Gladstone's ownership of each of these companies. While conceding that the companies may have been controlled by Mr. Gladstone's children, AHB presents evidence to suggest that Mr. Gladstone was in fact the owner of these entities and thus, that he owned the properties held by these entities.

The government identifies other properties which it claims Mr. Gladstone did not own "100%". The government also challenges Mr. Gladstone's failure to disclose an alleged $2.6 million liability owed to his ex-wife on his 1985 Financial Report. AHB has presented conflicting evidence regarding Mr. Gladstone's marital status in 1984.

The government contends that the disputed facts regarding these properties are irrelevant. According to the government, the undisputed evidence concerning the above-described properties is sufficient to sustain forfeiture of AHB's claims based on fraud.

jurisdiction over the government's defense to the plaintiff's breach of contract action.

With regard to summary judgment, it is well-settled that this court is required to enter summary judgment for a party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Unidynamics Corp. v. Automatic Prod. Int'l*, 157 F.3d 1311, 1316 (Fed.Cir. 1998). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. In this connection, a fact is material only if it will make a difference in the result of a case under the governing law. Importantly, "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In addition, in order to establish a genuine issue of material fact, the non-moving party must come forward with "significant, probative evidence demonstrating the existence of a triable issue of fact." *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1477 (11th Cir.1991). The evidence should be such that a fact finder could return a decision for the non-moving party. A mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the evidence in opposition to summary judgment is "merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (internal citations omitted).

The court is mindful that in many cases, proving a defense of fraud will require a trial to establish the state of mind of the individual alleged to have committed the fraud. However, this does not mean that summary judgment is never available in cases involving fraud. On the contrary, fraud may be proved by both admissions of false statements by the plaintiff and by circumstantial evidence. *O'Brien Gear & Machine Co. v. United States*, 219 Ct.Cl. 187, 591 F.2d 666, 672 (1979); *see Culley v. United States*, 1999 WL 314920 at *4 (Fed.Cl.1999); *DeRochemont v. United States*, 23 Cl.Ct. 87, 89 (1991). If the "facts are sufficiently clear, this court has held a plaintiff's claim forfeited under § 2514 in response to the defendant's motion for summary judgment." *Culley*, 1999 WL 314920 at *4; *see Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1042–43 (Fed.Cir.1994) (granting the government's motion for summary judgment on the issue of the government's Special Plea in Fraud defense, resulting in forfeiture of the plaintiff's claims).

## B. The Required Elements of Fraud under § 2514

As noted above, 28 U.S.C. § 2514 provides that a "claim against the United States *shall be forfeited* to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof. In such cases the United States Court of Federal Claims *shall specifically find* such fraud or attempt and render judgment of forfeiture." 28 U.S.C. § 2514 (emphasis added). *Glendale v. U.S.*, 239 F.3d 1374, 1379 (2001); *Farkas v. United States*, 57 Fed.Cl. 134, 146 (2003). The use of the word "shall" makes the judgment of forfeiture obligatory on the court; the court has no discretion to turn a blind eye to an attempt, whether successful or not, to commit fraud in the statement of a claim against the United States. *DeRochemont*, 23 Cl.Ct. at 90. Therefore, once the court has found fraud sufficient to satisfy § 2514, the court must enter a judgment of forfeiture. 28 U.S.C. § 2514; *DeRochemont*, 23 Cl.Ct. at 90.

In order to satisfy § 2514, however, the fraud alleged must be related to the contract at issue. *Little v. United States*, 138 Ct.Cl. 773, 152 F.Supp. 84, 87–88 (1957). Fraud in an unrelated transaction will not lead to forfeiture under this statute. However, when fraud is committed in regard to the

very contract upon which the suit is brought, the court will not divide the contract and allow recovery on part of it. *Id.; UMC Electronics v. United States,* 43 Fed.Cl. 776, 791 (1999), *aff'd* 249 F.3d at 1340 (2001).

 In order to prevail in its defense of fraud under 28 U.S.C. § 2514, the "burden is on the government to establish by clear and convincing evidence that the claimant has committed the fraud alleged." *Glendale,* 239 F.3d at 1379; *UMC Electronics,* 43 Fed.Cl. at 791 (internal citation omitted). This requirement has more specifically been rendered in the following way: "in order that a misrepresentation be *fraudulent* ... it must be both consciously false and intended to mislead." E. Allan Farnsworth, Farnsworth on Contracts, § 4.12 (2d Ed.1998). Thus, for the purposes of § 2514, the government must show: 1) that the plaintiff made a false statement to the government knowing that it was false; and 2) that this statement was intended to deceive the government. *Glendale,* 239 F.3d at 1379.[8]

### C. Section 2514 Applies to Fraud in the Formation of a Contract

By its terms, 28 U.S.C. § 2514 appears only to require forfeiture of a claim when the fraud practiced against the United States is in the "proof, statement, establishment, or allowance" of that claim. 28 U.S.C. § 2514. This may suggest that fraud will cause a claim to be forfeited only if the fraud is in the very claim for money being brought before the court. However, it is well established that this narrow reading does not represent the full extent of the force of § 2514. In *O'Brien,* the Court of Claims, predecessor to the Federal Circuit, thoroughly recounted the legislative history of the provision, highlighting the fact that "Congress intended by it that every *suit* brought in the Court of Claims should be subject to the forfeiture provided, on the commission of the specified fraud." *O'Brien,* 591 F.2d at 680 (emphasis

added). Similarly, in *Little,* the Court of Claims held that where "fraud was committed in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it." *Little,* 152 F.Supp. at 87–88. The requirement of *Little,* that there be no division of claims, taken in light of *O'Brien's* broad reading of the applicability of the provision, has led the Federal Circuit and this court to apply the forfeiture statute to situations outside the strict terms of the statute, as logic has dictated.

In *Supermex,* this court held the mandate of § 2514 to be "clear and unequivocal.... [A] claim against the United States is to be forfeited if fraud is practiced during contract performance...." The effects of the fraudulent act, therefore, had an effect on every aspect of contract performance, making it virtually impossible to distinguish between tainted and untainted claims. *Supermex, Inc. v. United States,* 35 Fed.Cl. 29, 39–40 (1996). Citing *Little,* the court held that the "practice of a fraud on part of a contract condemns the whole." *Id.* at 40. More recently, the Federal Circuit has affirmed this court's conclusion that § 2514 "is not confined to the presentment of a claim.... Court of Claims precedent and the legislative history of the statute all contemplate that a claim shall be forfeited if fraud against the government occurs during contract performance." *Anderson v. United States,* 47 Fed. Cl. 438, 444 (2000), *aff'd* 344 F.3d 1343 (2003); *accord UMC Electronics,* 43 Fed.Cl. at 791, *aff'd* 249 F.3d at 1340.

Outside the realm of contract performance, and with a similar view to effectuating the purpose of § 2514, courts have applied the statute to situations in which: fraud is practiced upon an arbitration board, *McCarthy v. United States,* 229 Ct.Cl. 361, 670 F.2d 996, 1001 (1982); fraud is practiced in the presentation of an invoice to a purchasing officer, *Jerman v. United States,* 96 Ct.Cl. 540, 554

8. The court is aware that in other cases this court has held that the government must prove the common law elements of fraud, namely: misrepresentation of a material fact; knowledge and intent to deceive or a reckless state of mind; justifiable reliance on the misrepresentation; and injury to the government. *See e.g. Long*

*Island Sav. Bank v. United States,* 54 Fed.Cl. 607 (2002). Now that the Federal Circuit has plainly spoken in *Glendale,* the court will focus primarily on the two elements identified above. Nevertheless, as discussed *infra,* the government has also established, in any event, all of the elements required for common law fraud.

(1942); and fraud is practiced in seeking an equitable adjustment, *Ab–Tech Constr. v. United States,* 31 Fed.Cl. 429, 434 (1994). These cases fit squarely with the recognition by Congress, as stated by the court in *UMC Electronics,* that " [t]he effects of a fraudulent act ... have an impact on every aspect of contract performance and the entirety of the claim, making it impossible to distinguish between tainted and untainted claims, for which reason the [plaintiff] may not recover on any claims under the contract.... [Therefore,] § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the government." *UMC Electronics,* 43 Fed.Cl. at 791.

▮ Therefore, in line with these cases, which have broadly construed § 2514 to effectuate the purpose of Congress in enacting the statute, this court holds today that § 2514 extends to the present case, in which fraud is alleged to have been practiced in connection with the formation of the contract. The Court of Federal Claims has not yet had occasion to consider this precise issue. However, it is as much within the purpose of the statute to prevent claimants from bringing claims against the United States on a contract after having practiced fraud in connection with the formation of the contract as it is to prevent suits by claimants who have practiced fraud in connection with performance.[9]

In numerous cases before the codification of § 2514, the Supreme Court and the Court of Claims expounded the principle that a plaintiff may not recover from the government either in law or in equity when the plaintiff fraudulently induced the government to enter the contract that is the basis of the suit. *See, e.g. Pan–American Petroleum & Trans. Co. v. United States,* 273 U.S. 456, 47 S.Ct. 416, 71 L.Ed. 734 (1927); *Causey v. United States,* 240 U.S. 399, 36 S.Ct. 365, 60 L.Ed. 711 (1916); *United States v. Trinidad Coal and Coking Co.,* 137 U.S. 160, 11 S.Ct. 57, 34 L.Ed. 640 (1890); *Mervin Contracting Corp. v. United States,* 94 Ct.Cl. 81, 1941 WL 4505 (1941); *Atlantic Contracting Co. v. United States,* 57 Ct.Cl. 185, 1922 WL 1881 (1922); *see also Paisner v. United States,* 138 Ct.Cl. 420, 150 F.Supp. 835 (1957).

In *Pan–American,* the government sued Pan–American for rescission of several contracts for the lease of petroleum reserves, alleging that Pan–American had procured these contracts through fraud. Pan–American maintained that as a condition of allowing the government to rescind its contract, equity required the Court to return to Pan–American the investment that it had made in the leased reserves, lest the government be unjustly enriched. The court recognized that, as between private parties "he who seeks equity must do equity," *Pan–American,* 273 U.S. at 505, 47 S.Ct. 416, thus requiring a party who rightfully rescinds a contract to restore the other party to the *status quo ante.* By contrast, when the government is the victim of fraud in the inducement, the Court held that it may rescind a contract with a party which fraudulently induced the government's entrance into the contractual relationship without returning the other party to the *status quo ante. Id.* at 506, 47 S.Ct. 416. The Court based its holding on the distinction that the:

> United States does not stand on the same footing as an individual in a suit to annul a deed or lease obtained from him by fraud. Its position is not that of a mere seller or lessor of land. The financial element in the transaction is not the sole or principal thing involved. This suit was brought to vindicate the policy of the Government, to preserve the integrity of the petroleum reserves and to devote them to the purposes for which they were created. The petitioners stand as wrongdoers, and no equity arises in their favor to prevent granting the relief sought by the United States. They may not insist on payment of the cost to them or the value to the Government of the improvements made.

*Id.* at 509, 47 S.Ct. 416.

The Court held that the United States, when contracting in the public interest rather

---

9. Although this case does not involve the False Claims Act, 31 U.S.C. §§ 3729–3733 (2004), it is important to note that courts have also held that even where the claim itself is not false, if the contract was obtained by fraud, any claim submitted under the contract must be rejected. *See e.g. Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 787 (4th Cir.1999).

than as merely a market participant, is not bound to return a defrauding contractor to the *status quo ante* when rescinding a contract fraudulently induced. *Id.* In the present case, the government entered into contracts with financial institutions during the Savings and Loan crisis not as a seller of property, but as a regulating agent. In promising regulatory forbearance in order to save failing thrifts, the government was not seeking a profit; rather it was seeking to prevent the closure of institutions that held the life-savings of their depositors. Plaintiffs that are shown to have fraudulently induced the government into entering a contract for the purchase of a financial institution during a financial crisis, the purpose of which is to prevent the deepening of that crisis and to protect the people of the United States, cannot come before this court seeking an equitable return to the *status quo ante* once their fraud is revealed. As the Supreme Court aptly put it, "no equity arises in their favor to prevent granting the relief sought by the United States. They may not insist on payment of the cost to them or the value to the Government" that they conferred before their fraud was discovered. *Id.; accord Trinidad Coal,* 137 U.S. at 170, 11 S.Ct. 57, (holding that when a purchaser of public lands obtains these rights from the government through fraudulent inducement, the government may rescind the contract without returning the purchase price of the land to the defrauding party); *Causey,* 240 U.S. at 402, 36 S.Ct. 365 (holding that it would frustrate government policy to return the consideration of a party who fraudulently induced the government into entering a contract once the government annulled the contract).

In a similar vein, the Court of Claims has held repeatedly that a party who fraudulently induces the government to contract with it may not recover either on the contract or upon a *quantum meruit.* In *Atlantic Contracting,* the plaintiff fraudulently induced the government to enter a contract for the provision of services and materials to the government. *Atlantic Contracting,* 57 Ct.Cl. at 195. The plaintiff argued that "the Government has received the benefit of its work and material, and that if by reason of fraud in the procurement ... it is not entitled to

recover under the contract, yet it is entitled to recover for the work done and the materials furnished, of which the Government has received the benefit." *Id.* at 193. The court, after finding that the plaintiff had induced the government to contract through fraud, held that the plaintiff had no right to recovery either on its contract with the government or because of the expenses it incurred and benefit it bestowed on the government. *Id.* at 196. Holding that any right in *quantum meruit* derived directly from the fraudulently induced contract, the court held that "[n]o court will lend its assistance in any way to carry out the terms of an illegal contract, nor will the court enforce any alleged rights directly springing from such contract." *Id.; see also Mervin Contracting,* 94 Ct.Cl. at 86 (holding that a fraudulent claim brought by the plaintiff forfeits rights founded both on a contract and upon a *quantum meruit); see also Paisner,* 150 F.Supp. at 838 (holding that the government may recover profit made by contractors on government contracts once it is determined that contracts were fraudulently induced).

More recently, the Court of Claims affirmed the continued vitality of this line of forfeiture cases in *K & R Engineering Co., Inc. v. United States,* 222 Ct.Cl. 340, 616 F.2d 469, 475 (1980). In that case, the plaintiff corporation was found to have been "involved in the corruption of the government official" who assisted the plaintiff's fraudulent procurement of a government contract. *Id.* When the government cancelled the fraudulently induced contract, the plaintiff sued for contract damages, and, in the alternative, for damages in *quantum meruit* or in *quantum valebat.* Rejecting the plaintiff's claims for relief, the court held that even when the government receives benefits under a contract, if the contract is tainted by fraud, then the plaintiff may not recover. The court held that, like previous forfeiture cases, it would not "affirmatively sanction[ ] the type of infected bargain which ... depriv[es] the public of the protection which Congress has conferred." *Id.* (citation omitted).

In sum, the Supreme Court and the Court of Claims, in analogous situations, have long adhered to the principle that a party that

fraudulently induces the government into entering a contract cannot claim damages based on the government's breach of contract. Furthermore, these courts have held that the government is not required to follow the general rule that, when annulling such a contract, the rescinding party must restore the defrauding party back to the *status quo ante.* Specifically, these courts have held that, in such situations, the government is required neither to restore the purchase price to the defrauding party nor reimburse it for expenditures incurred or benefit conferred by it which are associated with the contract. This court, if not compelled by these cases, then is impelled by them to extend § 2514 to cover this case, in which the fraud alleged is fraud in the formation of a contract with the government.

Having set up the elements required for fraud under § 2514, and having established that § 2514 extends to fraud in the formation of a contract, the court now turns to the application of the facts of this case to these principles.

### D. Mr. Gladstone Committed Fraud Against the Government in Connection with the Formation of the Government's Contract with AHB

#### 1. Mr. Gladstone Made False Statements to the Government

■ In order to determine whether Mr. Gladstone's statements on his 1984 Statement were false, the court is required to place the true facts side by side with the facts as alleged. *DeRochemont,* 23 Cl.Ct. at 89. Fraud is "established upon proof that statements made … are contrary to estab-

lished facts." *Culley,* 1999 WL 314920 at *4. In *Culley,* the plaintiff misrepresented the tax status of his property as an S corporation, established for tax purposes, when in fact it was not. *Id.* at *5. The court found that this misrepresentation rose to the level of fraud sufficient to warrant forfeiture of the plaintiff's claim. *Id.*

There is no dispute that neither Mr. Gladstone nor Gladstone Brothers held title to the below-mentioned properties at the time he submitted his financial information to the FHLBB. The Rt. 28 Bypass property was undisputably owned by Conrad. The East Industrial Park Properties were owned by East Industrial Park, Inc. The 420 Common Street property was owned by the Junk Realty Trust.[10] The Huse Road Properties were owned by Garjay. It is also not disputed that the C.A.G. Trust owned the properties in Chelmsford, Massachusetts and in Lanconia, New Hampshire.

Mr. Gladstone admitted under oath in depositions in other cases that Conrad owned the Rt. 28 Bypass property and that he did not have any beneficial interest in Conrad. This property is valued by the plaintiff at $180,000. In addition, Mr. Gladstone admitted under oath in depositions that neither he nor Gladstone Brothers owned any interest in Garjay, the company that owned the Huse Road properties, valued by the plaintiff at $2.5 million. Mr. Gladstone admitted under oath that he had sold the 420 Common Street property before 1985. 420 Common Street was valued at $535,000. He also acknowledged under oath that he did not own the East Industrial Park Properties, which were valued at $1 million. He stated that he believed that the East Industrial Park Prop-

---

10. AHB's argument that Mr. Gladstone could legally claim ownership of 420 Common Street, which was owned by the Junk Realty Trust, because the deed to this property was not recorded until 1985, is unsupported by law. The Massachusetts Recording Statute provides that "[a] conveyance of an estate in fee simple … shall not be valid as against any person, except the grantor [unless] it is recorded in the registry of deeds." Mass. Gen. L. Ch. 183 § 4. As the Massachusetts Supreme Court has held, "[t]he recording statute … does not affect the validity upon delivery of an unrecorded deed as between the parties to it or as to persons with notice…. It merely protects subsequent purchasers or at-

taching creditors without notice." *Aronian v. Asadoorian,* 315 Mass. 274, 52 N.E.2d 397, 398 (1943). Whether or not the deed conveying 420 Common Street was ever recorded, Mr. Gladstone, as grantor, did not retain ownership of this property. AHB's additional suggestion that the deed may not have been recorded until certain mortgages were removed fails to establish a genuine issue of material fact in dispute. Because the transfer of title occurred, it is irrelevant why the deed was not recorded. Moreover, mere allegations by counsel are not sufficient to create an issue of fact that will defeat a motion for summary judgment.

erties were owned by Conrad, another of the entities owned by his children.

The plaintiff claims that the government has failed to prove fraud by clear and convincing evidence based on a single statement from a deposition in which Mr. Gladstone stated, in response to a question regarding many properties, some of which he owned and some that he did not, that he owned all of the entities "a hundred percent." This single statement does not give rise to a triable issue of fact regarding Mr. Gladstone's ownership of the subject properties. AHB has not presented any evidence to cause the court to question whether Mr. Gladstone held title to these properties. The deeds of the properties speak for themselves and there is no evidence to refute the government's proof that Mr. Gladstone was not identified as an officer, director or shareholder of any of the corporations that own the properties. AHB has also failed to identify any evidence to show that Mr. Gladstone was a beneficiary of Conrad or the C.A.G. Family Trust. Thus, Mr. Gladstone's single statement that he owned all of the properties he listed in his 1984 Statement in response to a question involving properties and entities, some of which he did in fact own, is not by itself sufficient to defeat a motion for summary judgment. This evidence is not "significantly probative" by any measure. At best, it confirms Mr. Gladstone's fast and loose treatment of the truth.

AHB's contention that Mr. Gladstone could legally claim ownership of the Chelmsford and Lanconia properties is not supported. AHB has not presented any evidence to show that the properties were not owned by the C.A.G. Family Trust. Nor has AHB presented any evidence to refute Mr. Gladstone's admission in his deposition that he did not own the properties. Instead, AHB relies on legal arguments to suggest that Mr. Gladstone had the right to claim these properties as his own. As discussed below, AHB's arguments regarding the properties owned by the C.A.G. Family Trust are unsupported.

Contrary to AHB's arguments, Massachusetts law does not allow a spouse to claim property owned in trust by the other spouse as his own for trusts formed prior to 1984. According to AHB, the C.A.G. Family Trust was created in 1981. Until 1984, Massachusetts law gave spouses an absolute right to transfer property out of the marital estate through a trust. *See Kerwin v. Donaghy,* 317 Mass. 559, 59 N.E.2d 299, 306 (1945). In 1984, the court in *Sullivan v. Burkin,* 390 Mass. 864, 460 N.E.2d 572, 577 (1984), reversed this rule, and held that the "rights of the surviving spouse should not be so restricted." However, the *Sullivan* court specifically limited its ruling to trusts "created or amended after the date of this opinion." *Id.* at 577, 460 N.E.2d 572. It is not disputed that the C.A.G. Family Trust pre-dated *Sullivan* and, therefore, the older *Kerwin* rule applies to this trust. Accordingly, Mr. Gladstone had no right to claim he owned the properties belonging to the C.A.G. Family Trust. Indeed, in his 1992 Deposition, Mr. Gladstone himself recognized that he did not own these properties.

In sum, Mr. Gladstone admitted under oath that, as of the time of the 1984 Statement, he did not own Rt. 28 Bypass, the Huse Road properties, or 420 Common Street. He also acknowledged under oath that he did not own the East Industrial Park Properties. Finally, Mr. Gladstone admitted that he had no interest in the trust which owned the Chelmsford and Lanconia residences. Nevertheless, Mr. Gladstone claimed these properties as his own on his submissions to government regulators. Just as the court in *Culley* determined that a misrepresentation as to the *tax status* of property was a false statement sufficient to give rise to forfeiture under § 2514, with even greater certainty does this court find that misrepresentation as to *ownership* of property constitutes fraudulent behavior.

### 2. Mr. Gladstone had the State of Mind Required for Fraud

The level of knowledge required to make a false statement knowingly fraudulent is described by the term scienter. Scienter is sometimes described as conscious falsity. Farnsworth on Contracts § 4.12. While intent will satisfy the test for scienter, so too will scienter be found if "the maker simply

lacks confidence in its knowledge of the facts but nevertheless chooses—'recklessly,' as is sometimes said—to assert them as of its own knowledge." Farnsworth on Contracts, § 4.12.

Mr. Gladstone's misrepresentations were consciously false. Mr. Gladstone admitted in his depositions that he knew that he did not own Rt. 28 Bypass, the Huse Road Properties, the East Industrial Park Properties, and 420 Common Street. Mr. Gladstone also admitted that he knew he did not own an interest in the entities that owned the subject properties. He also admitted that he did not own the Chelmsford and Lanconia properties.

In the first instance, these admissions lead to the inference that Mr. Gladstone was aware that his statements were false at the time that made them. To counter this inference, the plaintiff would have to present evidence showing that Mr. Gladstone had innocently included these properties on his submissions because he was honestly mistaken about the true ownership of these properties. This AHB has failed to do.

The plaintiff's specious legal arguments as to Mr. Gladstone's ownership of the trust properties or 420 Common Street do nothing to negate the inference that Mr. Gladstone possessed the requisite state of mind when he made false statements to the government. A maker of false statements can have the requisite scienter under § 2514 even if he does not know for certain that his statements are false, as long as the statements are made with reckless disregard for the truth. Farnsworth on Contracts § 4.12. In this case, Mr. Gladstone responded to specific questions about his financial strength with false statements. The plaintiff's post hoc legal rationalizations about why Mr. Gladstone might actually have properly included certain properties does nothing to negate the fact that at the time he made the false statements, Mr. Gladstone believed them to be false. The plaintiff has twisted the law to imply that Mr. Gladstone might have fortui-

tously told the truth about some of the disputed properties, despite his recklessness with regard to whether he was telling the truth. In such circumstances, Mr. Gladstone still possessed the state of mind required to qualify for forfeiture under § 2514.

For the foregoing reasons, the court finds that Mr. Gladstone knowingly or with reckless disregard of the truth made a false certification on his 1985 Financial Report when he included the Chelmsford and Laconia properties on the form as well as the value of the properties owned by Garjay, East Industrial Park, Inc., Junk Realty Trust and Conrad Realty Trust within the $22 million net worth of Gladstone Brothers. Mr. Gladstone then compounded his lies by supporting the certification with his false 1984 Statement of Financial condition. In all, Mr. Gladstone included over $4.5 million worth of property on his certified financial forms that he did not own.

Given Mr. Gladstone's admissions that he knew his statements were false when he made them, along with the plaintiff's inability to present any evidence offering an otherwise innocent explanation for Mr. Gladstone's false statements, the court has no choice but to conclude that the government has established by clear and convincing evidence that Mr. Gladstone had the requisite state of mind to defraud the government within the meaning of the Special Plea in Fraud statute. There is no doubt that Mr. Gladstone either knowingly made false representations on his financial forms or made these statements with reckless disregard for whether his representations were true or false.[11] Therefore, the court finds that Mr. Gladstone's state of mind when making the false statements rises to the level of the scienter required to make his statements fraudulent under § 2514.

### 3. Mr. Gladstone Intended to Deceive the Government

The government has also clearly and convincingly established that Mr. Gladstone intended to deceive the government by in-

---

11. AHB concedes that a trial to test the truthfulness of Mr. Gladstone's claim that he owned all of the properties he listed on his 1984 Statement is not necessary. Specifically, AHB's counsel agreed that the one deposition statement in which Mr. Gladstone claims to have owned all the disputed properties is not a disputed issue of fact. Trans. of May 28, 2004 at 65, 67.

cluding false information on his financial statements. "Intent to deceive" is found when the "maker acts either with desire to mislead another or in the belief that the other is substantially certain to be misled.... It is not necessary that the maker have any particular recipient in mind at the time the misrepresentation is made." Farnsworth on Contracts § 4.12. As noted above, fraud may be proved by circumstantial evidence. *O'Brien,* 591 F.2d at 672; *see Culley,* 1999 WL 314920 at *4; *DeRochemont,* 23 Cl.Ct. at 89. In the present case, the circumstances surrounding Mr. Gladstone's misrepresentations indicate clearly and convincingly that, at the time he made these false statements, Mr. Gladstone believed that his statements were substantially certain to mislead.

It is not disputed that Mr. Gladstone was aware that the government had a policy of approving bank acquisitions for people with integrity who were financially sound. As Mr. Elliot of the FHLB of Boston said, "the honesty and integrity of the acquirers was a fundamental concern that I, and other regulators, had in approving the acquisition of any institution, such as Home." Declaration of Elliot 7/18/2002; *see American Heritage I,* 56 Fed.Cl. at 600; *accord Anderson,* 47 Fed. Cl. at 446, *aff'd* 344 F.3d 1343 (finding that "critical to the FHLBB was the viability of the converted thrift and the integrity of those who would run it," including the "integrity of the new management."). Mr. Gladstone, fully aware of the importance of his truthfulness in financial matters, knowingly lied about his assets and thus his financial strength. The only conclusion that can be drawn is that Mr. Gladstone intended to deceive the government by these false statements in order to facilitate AHB's acquisition of Home.

It is certain that Mr. Gladstone was aware of the importance of his statements to the process of AHB's application to acquire Home. As discussed above, Mr. Peckham met with Mr. Gladstone and told him that he needed to submit evidence to support the net worth of Gladstone Brothers. In particular, the government wanted to confirm his claim of holding over $22 million in assets through Gladstone Brothers. The uncontested Peckham memorandum notes that Mr. Gladstone was told at that same meeting that he also needed to be forthcoming about his past legal troubles. He therefore was on notice about the government's concerns with his truthfulness. Despite these concerns, Mr. Gladstone failed to disclose that Gladstone Brothers was only a trade name and that the properties were owned by numerous entities. In addition, Mr. Gladstone included in his 1984 Statement more than $4 million in net assets that he did not own. The only inference to be drawn from his decision to include those properties is that his intention was to influence the government's decision by inflating his wealth.

AHB's effort to dispel Mr. Gladstone's intent to deceive by arguing that Mr. Gladstone was perhaps wealthier than he represented in his 1984 Financial Statement is misdirected. AHB argues, based on Mr. Gladstone's financial statements for subsequent years, that Mr. Gladstone's wealth increased in the years after 1984; therefore by the time AHB acquired Home, Mr. Gladstone was perhaps wealthier than he represented in his 1984 Statement. First, the argument is factually unsupported. AHB relies upon financial statements that also include several of the properties that the court has already found were not owned by Mr. Gladstone. In addition, financial statements for subsequent years are not relevant to prove Mr. Gladstone's wealth for the year in question. Fluctuations in property values from year to year render financial statements for future years irrelevant.

Similarly, AHB's reliance on Mr. Gladstone's representations to Vanguard Bank is misplaced. Mr. Gladstone's representations to Vanguard or others do not establish the accuracy of his wealth in 1985. Indeed, Vanguard loaned millions to Mr. Gladstone, and when Mr. Gladstone declared bankruptcy in the 1990s, he owed Vanguard approximately $10 million. Thus, Mr. Gladstone's submissions to Vanguard hardly prove that his real wealth in 1985 was sufficient to support AHB's application to acquire Home.

Finally, AHB contends that, even if Mr. Gladstone intended to deceive the govern-

ment about the above-mentioned assets, this deception was not a *material misrepresentation.* AHB argues that in order to be "material," the subject of the deceit must have been of critical importance to the regulators' decision to allow the acquisition of Home. AHB argues that the regulators were only concerned with cash and liquid assets, and not with assets tied up in real property; therefore, any misrepresentation as to the ownership of real property is not material and so does not satisfy the requirements of the Special Plea in Fraud defense.

The government argues in response that materiality of the type identified by AHB is not required. According to the government, so long as the false statement was made for the purpose of influencing the government's decision, it does not matter whether the false statements involved information that was critical to the government's approval process. *See Harrison,* 176 F.3d at 787. The government argues, alternatively, that if a case involves a false certification, materiality is in effect presumed.

The court agrees with the government and finds that when a false certification is made to influence the government's decision, materiality is presumed. The Federal Circuit recently recognized a similar principle in the context of the defense of prior material breach. The court held, in that context, that where the party submits an otherwise fraudulent document to the government, materiality is presumed. *Christopher Village v. United States,* 360 F.3d 1319, 1335 (Fed.Cir.2004) (holding that in such circumstances "any degree of fraud is material as a matter of law"). The same result is mandated here. In addition, although the court agrees with the government that materiality is presumed in cases involving fraud, it is also clear in this case, that the misrepresentations, which were in excess of $4 million, or 20% of Mr. Gladstone's net worth, are material in any event.

In sum, the court finds that the government has proven, by clear and convincing evidence, that the false statements made by Mr. Gladstone to federal bank regulators in his 1984 Statement and his 1985 Financial Report were made with intent to deceive the government. Mr. Gladstone knew that he was the key to the AHB–Home transaction; he knew that bank regulators were concerned with his honesty and integrity; he knew that the regulators would be relying on the truthfulness of his statements when making their decision about the transaction. Nevertheless, Mr. Gladstone made significant misrepresentations to bank regulators about his ownership of properties, knowing that these representations were false. The misrepresentations resulted in the deception of bank regulators as to Mr. Gladstone's net worth. The court can draw no other conclusion but that Mr. Gladstone either acted "with desire to mislead another or in the belief that the other is substantially certain to be misled." Farnsworth on Contracts, § 4.12. Therefore, the court finds that Mr. Gladstone intended to deceive the government within the meaning of § 2514.

The government has proven by clear and convincing evidence that Mr. Gladstone made false representations to the government, either knowing that these statements were false or without regard to their truth or falsehood, either desiring or believing that the government would be deceived thereby. In such circumstances, the court finds that the government has satisfied all of the elements necessary to trigger the application of 28 U.S.C. § 2514.

### 4. The Government Justifiably Relied on, and was Injured by, Mr. Gladstone's Misrepresentations

Although it is not strictly required in this case, the government has also made an ample showing that the government regulators did in fact rely on Mr. Gladstone's false statements and were injured as a result.

AHB does not contest that Messrs, Elliot, Peckham, Gridley, Shaw, and Webber expressly stated that they relied upon Mr. Gladstone's representations regarding Gladstone Brothers in making their recommendations for approval. It is also clear from their declarations that they would not have likely approved of the acquisition had they understood that there was no Gladstone Brothers Corporation and that Mr. Gladstone did not own 100% of the properties which he claimed were owned by Gladstone Brothers.

The government established through the deposition testimony of Elliot, and the affidavits of the other regulators, that they relied upon Mr. Gladstone's financial statements to make their decision. The following exchange occurred during Elliot's deposition:

Q: [I]n view of what you have seen today describing Gladstone Brothers, ... do you still have a concern that Mr. Gladstone misrepresented his assets when he reported to the Bank Board that Gladstone Brothers had $22.8 million in assets in October 1985.

A: Yes.

Q: Why is that?

A: The level of confusion and uncertainty and misstatement in the deposition[ of Gladstone] and in the various documents that I saw then, compounded by some of the things that you have shown me today, lead me to conclude even more that there is just too much uncertainty, perhaps misrepresentation, for me to have recommended approval of the merger at that time.

AHB App. at 143–144.

Elliot indicated that he would have required Mr. Gladstone to submit audited financial forms and to explain any discrepancies. AHB App. at 145.

The honesty and integrity of the acquirers of Home was of key concern to the government. The government was not simply concerned with Mr. Gladstone's financial status, the government was also concerned with his integrity. By failing to fully and fairly disclose all of his businesses and corporate identities, Mr. Gladstone kept the government from being able to fully evaluate Mr. Gladstone's merger application. Finally, it is not disputed that the acquisition by AHB was not successful and that Home eventually failed. Thus, not only did the government rely on Mr. Gladstone's misrepresentations, but it was ultimately harmed by approving the acquisition.

**E. Mr. Gladstone's Fraudulent Statements Can be Imputed to AHB**

■ Gladstone's statements, however fraudulent, will work no forfeiture of claims brought by AHB unless his statements can be imputed to AHB. This court does not lightly impute fraud committed by an employee to his corporation. *See First Fed. Sav. Bank of Hegewisch v. United States*, 52 Fed.Cl. 774, 791 (2002) (holding that not "every action an employee takes is automatically imputed to the corporation. If the employee is acting outside of his or her actual or apparent authority ... the corporation is generally not liable for said actions.")

That being said, the Court of Claims and this court have recognized that "a corporation can act only through its officers and agents, and when they are clothed with the authority to act for it, the corporation is responsible for their acts." *Wagner Iron Works v. United States*, 146 Ct.Cl. 334, 174 F.Supp. 956, 958 (1959); *Anderson*, 47 Fed. Cl. at 448, *aff'd* 344 F.3d 1343. In *Anderson*, the court considered the imputation to a bank of the fraud of one of its employees. The court noted that the defrauder "was not just an officer 'clothed with the authority to act;' he, as CEO, Chairman of the Board and majority shareholder, in effect" controlled the bank. *Anderson*, 47 Fed.Cl. at 448. The court also found that the defrauder's "fraudulent acts, including lying to federal banking regulators, were done ostensibly to ... benefit the bank." *Id.* Consequently, the court imputed the officer's fraudulent acts to the bank. *Id.* Similarly, in this case Mr. Gladstone was not just a shareholder but the single largest shareholder of AHB. As noted above, Mr. Gladstone signed the H-(e)1 Application as President of AHB, warranting that AHB's application was "true and correct to the best of his knowledge and belief." H-(e)1 Application, Def.App. at 19. Mr. Gladstone signed his personal Biographical and Financial Report as President and Director of AHB, representing and warranting that the information contained in the report was "true, correct and complete." Biographical and Financial Report from Gladstone to FHLB of Boston, of 10/28/85, Def.App. at 49. Furthermore, Mr. Gladstone's actions were plainly taken to benefit AHB. The result of Mr. Gladstone's successful fraudulent inducement was for AHB to acquire Home. As a result, Mr. Gladstone would have to support AHB's financial commitment to Home. These

uncontested facts lead the court to conclude that Mr. Gladstone's fraudulent acts are properly imputed to AHB and thus AHB's claims must be forfeited under the Forfeiture of Fraudulent Claims statute, 28 U.S.C. § 2514.

## CONCLUSION

In view of the foregoing, the court finds that the government has proven by clear and convincing evidence that Mr. Gladstone committed fraud when he, on behalf of AHB, submitted false statements on his certified financial disclosure forms and on the 1984 Statement he submitted to bank regulators. The government has proven by clear and convincing evidence that Mr. Gladstone knew that he did not own a 100% interest in the properties he claimed as his own, and that he falsely claimed ownership of over $4 million worth of property with intent to deceive the government. Furthermore, the government has proven that, due to his representations of control of AHB, as well as his prominent place at the head of AHB, Mr. Gladstone's fraud may be imputed to AHB for the purpose of a finding of fraud. Consequently, the court finds any and all of AHB's claims which arose as a consequence of AHB's contract with the United States for AHB to acquire Home must be forfeited under 28 U.S.C. § 2514. The government's cross motion for summary judgment on the issue of forfeiture of fraudulent claims is **GRANTED**. The plaintiff's cross motion for summary judgment on the issue of forfeiture of fraudulent claims is, therefore, **DENIED**. The clerk is hereby directed to enter judgment for the United States. Each party shall bear its own costs.